Benjamin Joseph **HARVILLE**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 58368.

Court of Criminal Appeals of Texas, Panel No. 2.

Dec. 12, 1979.

Rehearing En Banc Denied Jan. 16, 1980.

David B. Ziegler, Houston, for appellant.

Carol S. Vance, Dist. Atty., James C. Brough and Larry Urquhart, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for murder. After the jury found that appellant had previously been convicted of a felony, punishment was assessed at life.

In three related grounds of error, appellant contends that the trial court erred in admitting his written confession into evidence. He maintains that the confession was inadmissible due to the fact that he was denied his right to counsel while the confession was being taken. Appellant further argues that the confession was the result of inducement and various threats by the officer who took the statement.

Appellant filed a motion to suppress his confession and the court held a hearing thereon in compliance with *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), and Art. 38.22, V.A.C.C.P. Officer Sabino Montemayor, of the Baytown Police Department, testified that appellant was arrested in Baytown on April 8, 1975, at approximately 4:50 p. m. At the time appellant was arrested, he was given his "blue card warnings" by Montemayor. Twenty-five minutes after his arrest, appellant was taken before the Honorable Steve Hebert, Municipal Court Judge, and given the warnings contained in Art. 15.17, V.A.C. C.P.

Montemayor stated that two hours later, appellant gave his first written statement to Officer R. P. Merchant of the Baytown Police Department. Merchant stated that prior to taking this statement, he gave appellant his "blue card warnings" and explained the warnings required by Art. 38.22, supra, which were contained at the top of the statement. Merchant related that appellant said that he understood the rights which were explained to him and that he never indicated that he wanted an attorney.

Montemayor testified that the following morning, appellant approached him and said, "I have more to tell you. I need to talk to you, I have more to tell you." After appellant was again given his warnings, he told Montemayor that he understood the warnings and that all he wanted to do was clear things up. At this time, appellant made his second written statement which was later admitted into evidence at trial.

Appellant's father, James Harville, testified that he saw appellant in Montemayor's presence shortly after the second statement was made. When Harville asked his son why he had made the statement, appellant said that Montemayor had told him, "Look, son, we already have enough on you to send you to the electric chair, so if you go ahead and sign the statement, it will go easier for you." Harville related that when appellant made this statement, Montemayor nodded in agreement with what appellant had said.

Appellant testified that while Montemayor was questioning him, he was told that if he did not sign the statement, he would receive the death penalty. On the other hand, he was told that if he would make the statement, he would only receive life. Appellant further stated that Montemayor threatened that if appellant did not sign the confession, the authorities would hold appellant's brother as a party to the offense. Lastly, appellant related that while he was talking to Montemayor, he indicated that he wanted to talk to his parents about hiring a lawyer.

On rebuttal, Officer Montemayor denied having ever threatened appellant with regard to either the death penalty or filing charges against appellant's brother. He further stated that appellant had not made any statements to his father regarding the death penalty, nor had appellant indicated that he wanted to talk with anyone regarding the services of an attorney.

At the conclusion of the hearing, the trial court found that the confession had been voluntarily made and was admissible. The court later made findings of fact and conclusions of law which recited that appellant had effectively waived his right to have a lawyer present during the time that he was questioned. The court further found that appellant had freely and voluntarily made the statement, without threats, compulsion, persuasion, duress, coercion or any other improper influence. Lastly, the court specifically found that appellant was not threatened by Montemayor with regard to the death penalty and filing charges against appellant's brother.

Appellant maintains that his confession is inadmissible because the record is silent as to a knowing and intelligent waiver of his right to have counsel present during questioning. He appears to argue that the record must contain an express waiver in order for the confession to be voluntary.

■ Whether a defendant waives his right to remain silent and have counsel present during questioning is to be determined based upon the totality of the circumstances. *Williams v. State*, Tex.Cr.App., 566 S.W.2d 919. A waiver of counsel does not have to be expressly made, but can be determined from the circumstances surrounding the taking of the confession. *Moreno v. State*, Tex.Cr.App., 511 S.W.2d 273. Thus, the fact that a defendant does not specifically say that he waives counsel does not prevent the trial court from concluding that he knowingly and intelligently waived counsel. *Thomas v. State*, Tex.Cr.App., 458 S.W.2d 817. We find appellant's contention that there can be no waiver of counsel without an express waiver to be without merit.

Appellant next maintains that the State failed to rebut his testimony that the state-

ment was given as a result of threats against his brother and in order to avoid the death penalty. He argues that the absence of such rebuttal evidence rendered the confession inadmissible as a matter of law.

■ Whenever the defendant's testimony indicates that he made a confession as a result of coercive acts and such testimony is uncontradicted, then the confession is inadmissible as a matter of law. *Farr v. State*, Tex.Cr.App., 519 S.W.2d 876. However, when such alleged acts of coercion are disputed, the issue is one of fact to be determined by the trier of fact. *Farr v. State*, supra.

In the instant case, appellant claimed that he made the confession as a result of inducements and threats by Montemayor. On rebuttal, Montemayor specifically denied all of the allegations made by appellant. Such denial disputed appellant's earlier assertions of coercion and raised a question of fact to be determined by the trial court. We find that appellant's confession was not inadmissible as a matter of law due to the alleged acts of coercion by Montemayor.

■ The judge at the *Jackson v. Denno* hearing is the sole judge of the weight and credibility of the witnesses. He may believe or disbelieve all or any part of any witness' testimony. *Hughes v. State*, Tex.Cr.App., 562 S.W.2d 857; *Myre v. State*, Tex.Cr.App., 545 S.W.2d 820. The evidence raised issues of fact as to waiver of counsel and alleged coercive acts by Montemayor. We find that there was evidence to support the trial court's finding that appellant waived counsel and that Montemayor did not act improperly in taking appellant's confession. We conclude that under the totality of the circumstances the evidence supports the court's finding that appellant's confession was freely and voluntarily given after he had been fully appraised of his rights and affirmatively waived those rights. Appellant's first three grounds of error are overruled.

■ In his next ground of error, appellant contends that the evidence is insufficient to support the conviction. He maintains that the State relied on circumstantial evidence.

Jack Roberts testified that he owned Jack's Bar in Baytown. He stated that at approximately 2:30 a. m. on April 5, 1975, he returned to the bar after going to get something to eat. After entering a storeroom in the rear of the bar, he noticed his wife, Mildred Roberts, on the floor with no pants on. As Roberts started walking toward his wife, he was hit in the back of the head by an individual. The individual then knocked Roberts to the floor and started hitting him with a stepladder. The next event Roberts remembered was going to Gulf Coast Hospital and asking someone to see about his wife. Roberts was not able to identify the individual who attacked him.

Officer James Snow, of the Baytown Police Department, testified that he arrived at Jack's Bar at approximately 2:50 a. m. When he arrived, he noticed smoke coming out the building. After firemen from the Baytown Fire Department had controlled the fire, Snow found the body of Mildred Roberts. Snow related that there was a large pool of blood behind the body and blood was splattered both on the body and on the walls of the storeroom.

Dr. Ethel Erickson, an assistant medical examiner for Harris County, testified that the deceased died as a result of asphyxia due to manual strangulation and blunt trauma to the face, head and chest. Dr. Erickson related that some of the injuries suffered by the deceased were consistent with having been stomped with an individual's feet. Lastly, vaginal and rectal smears taken of the body were positive for the presence of spermatozoa.

The State then called several patrons of Jack's Bar. These customers testified that they had seen appellant in the bar prior to closing time during the early morning hours of April 5, 1975.

Officer Montemayor then testified concerning the arrest and confession given by appellant. The confession was read to the jury. In the confession, appellant stated

that he went to the bar at approximately 9:00 p. m. on April 4, 1975. He stated that he drank several bottles of beer and talked to Mildred Roberts. As closing time neared, appellant helped Roberts restock the coolers with cases of beer from the storeroom of the bar. The confession then states:

". . . By this time I was pretty angry because Millie had led me on, and now she was refusing my advances. I think I said, 'how about me going home with you.' and she said, 'no.' I then hit her in the stomach and she doubled over, I then knocked her down, I then took hold of her ankles and dragged her to the storeroom which was still open. There was a light in the hall shining into the storeroom. As I let go of her ankles she tried to get out and I again grabbed her and took her to the storeroom. When I got her back again in the storeroom, her head was close to the beer cases and her feet were to the entrance of the storeroom door. I then pulled her slacks and pants off of her. She was hollering and moving her arms around. I kept telling her to be quiet and I hit her on the face to keep her from attracting somebody's attention. Millie would not be quiet so I grabbed her by the throat with both hands and squeezed. I was facing her when I was squeezing her throat. She quit hollering and I released my hold on her throat. She was grasping for air, and she was on her back, so I unbuckled and undone my pants and dropped them. I then dropped to my knees and placed her thighs spread apart on my thighs. I then commenced to have intercourse with her. I would take my penis out and then go in. I don't believe I ever put it in her rectum, and as best I can recall I was putting my penis in her vagina. I don't recall reaching a climax, but I do remember my penis went soft and I quit. I know for a fact I had no sensation of reaching a climax and I have never been that drunk not to remember that. After that I pulled my pants up and left Millie there. I remember she was still sort of moaning. I then started to leave, however before I reached the main part of the establishment, I saw the front door opening. I felt trapped because I knew I had f_____. up to put it bluntly, and the only way I knew I could escape was being blocked. I then ran toward the back, trying to get out the back door. It was dark back there and I could not get out, so I got back to where Millie was. The storeroom where this happened I recall there is some beer cases to the front as you go into it. To the left of the door is an area where I stood and could not be seen from the hallway. There was some stacked empty cardboard boxes, that were flat by where I was standing. Her husband came in the storeroom and said, 'My God what happened,' As he saw Millie laying there. He stepped toward her and was bending over her when I hit him in the stomach, and he more or less turned toward me and I hit him in the face. We more less got into a fight then, and I finally was able to knock him down. He started saying, 'I give up, I give up.' I then left him there laying on his back, with his feet toward Millie. I started out and went to the bar to get my cigarettes and my lighter. By this time I really knew I had messed up and was trying to figure out a way to get rid of all the evidence and the only thing that came to my mind was to set the place on fire. I walked back to the storeroom to where the cardboard boxes were at. Jack and Millie were still laying there. Jack was moaning like if he was hurt. I then lite (sic) up the cardboard boxes with my lighter and left out the front door. At the time I set the fire, I knew Jack was still able to get out of the fire and I was hoping he would get Millie out also. My only reason for setting the place on fire was to eliminate all evidence that would tend to tie me in to this mess."

Appellant testified that after the bar closed, he went into the storeroom and had intercourse with the consent of the deceased. He stated that while in the storeroom, someone came into the bar and the deceased said, "Oh, my God, that is my

husband. He will kill us both." Appellant stated that when he was confronted by Roberts, they had a fight. Appellant left the bar after Roberts told him, "I give up." Appellant saw Roberts leave the bar in a truck. Appellant then went to his brother's home and asked him to state that he had been there all night if questioned by anyone.

While appellant's confession may not be a full admission of the offense of murder, we find that when his statement and the evidence presented at trial are considered together, there is direct evidence of his commission of the offense. See, *Williams v. State*, supra; *Knight v. State*, Tex.Cr.App., 538 S.W.2d 101. Thus, appellant's contention that the State relied solely upon circumstantial evidence to prove his guilt is without merit.

We find the evidence sufficient to support the conviction.

■ In his last ground of error, appellant contends that his court-appointed attorney was not given ten days to prepare for trial.

The record reflects that appellant had originally been indicted for capital murder in Cause No. 241380 in the 179th Judicial District Court. On February 18, 1976, the Honorable William O. Olsen, Jr., filed a motion in Cause No. 241380 which recited in part that he was appellant's court counsel. The indictment in the instant case, Cause No. 241691, was filed on March 8, 1976, and recites that it is a reindictment of former Cause No. 241380. The new indictment alleged the primary offense of murder with one prior conviction alleged for enhancement. Trial on the merits in the instant cause commenced on March 8, 1976.

At a pre-trial hearing, the following colloquy took place between the court and counsel for appellant:

"THE COURT: Do we have the old case here? It is agreeable with all parties that the motions filed, now filed in Cause No. 241380 may be transferred to file No. 241691, the new indictment; is that correct?

"MR. OLSEN: That is correct as far as the defense is concerned."

The record further reflects that appellant was represented by two other attorneys during his trial. One of his other attorneys was the Honorable Gerald Fry. In a letter dated January 12, 1976, appellant informed the court that Fry had been retained to represent him.

Art. 26.04(b), V.A.C.C.P., provides:

"(b) The appointed counsel is entitled to ten days to prepare for trial, but may waive the time by written notice, signed by the counsel and the accused."

It has been held that the above statute is not applicable when the defendant is represented by retained counsel. See, *Banks v. State*, Tex.Cr.App., 494 S.W.2d 839. Furthermore, in *Bowers v. State*, Tex.Cr.App., 570 S.W.2d 929, we held that there must be a showing that counsel was in fact appointed in order to find a violation of Art. 26.-04(b), supra. In the instant case, the record does not reflect that Fry was appointed to represent appellant at trial. Indeed, appellant's letter to the court indicates that Fry was in fact retained. We find this ground of error to be without merit.

The judgment is affirmed.