Keith Robert TURNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–06–01153–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

March 20, 2008.

---

Stephen Morris, Houston, for appellant.

Dan McCrory, Houston, for appellee.

Panel consists of Chief Justice HEDGES and Justices ANDERSON and BOYCE.

## OPINION

JOHN S. ANDERSON, Justice.

A jury found appellant, Keith Robert Turner, guilty of aggravated sexual assault and assessed punishment at ninety years' confinement in the Texas Department of Criminal Justice, Institutional Division. *See* Tex. Penal Code Ann. § 22.021 (Vernon 2003). In four issues, appellant argues (1) the trial court erred in denying his motion to suppress because appellant's videotaped statements were the product of an unlawful arrest, (2) the trial court erred in denying his motion to suppress because appellant did not waive his *Miranda*[1] rights before making the videotaped statements, (3) the trial court erred in admitting the expert testimony of a police officer regarding blood spatter, and (4) the trial

---

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

court erred in admitting evidence which was not properly identified. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In April 2006, David Ritcheson, the complainant, and Gus Sons attended the crawfish festival in Spring, Texas. Before leaving for the festival, both boys drank vodka, took Xanax and smoked marijuana. Gus and Ritcheson met up with David Tuck and appellant while at the festival. Later that evening, Gus's mother drove all four boys back to the Sons's house, and left them alone with Danielle Sons, Gus's little sister, and Danielle's friend, Desiree. The four boys continued to drink, smoke marijuana, and use drugs throughout the night.

At some point during the evening, Danielle told Gus that Ritcheson tried to kiss her. Tuck, overhearing this allegation, became very angry with Ritcheson and punched him in the face. Ritcheson fell down and appeared to be knocked out. Tuck and appellant then proceeded to drag Ritcheson outside and severely beat him for approximately fifteen minutes. Appellant hit and kicked Ritcheson while Tuck stomped on him with his steel-toed boots. While beating Ritcheson, Tuck referred to Ritcheson as a "beaner" and shouted things such as "white power" and "Aryan nation."

After beating Ritcheson, Tuck and appellant stripped him naked, and then Tuck cut Ritcheson's chest with a knife and burned Ritcheson's stomach and chest with his cigarette. Next, Tuck kicked Ritcheson onto his stomach while appellant retrieved a plastic umbrella pole from the outdoor patio furniture. Appellant placed the pole in Ritcheson's rectum and held it in place. Appellant looked at Tuck and nodded toward Ritcheson. Tuck then kicked the end of the pole into Ritcheson's rectum. Finally, the two boys dragged

Ritcheson to the back fence and poured bleach over his body.

Approximately one to two hours after the assault, Tuck and appellant left the Sons's house. Gus and Danielle, who both witnessed the assault, fell asleep that night, but when Gus woke up the next morning, Ritcheson was still lying in the backyard. Gus told his mother, and she called 9-1-1. Emergency personnel arrived and immediately transported Ritcheson to the hospital.

Michael Wienel, the lead detective, interviewed Tuck at the scene and subsequently arrested him.[2] Wienel determined appellant was too intoxicated to interview at that time, so he left appellant at the scene. Two days later, Officers Rocha and Phillips took appellant to the police station to ask some questions. Appellant gave two videotaped statements, and in his second statement, appellant admitted some involvement in the offense. Wienel arrested appellant as a result of the second statement.

Appellant filed a motion to suppress his videotaped statements, which the trial court denied after holding a pretrial hearing. A jury subsequently found appellant guilty of aggravated sexual assault and assessed punishment at ninety years' confinement in the Texas Department of Criminal Justice, Institutional Division. *See* Tex. Penal Code Ann. § 22.021. This appeal followed.

DISCUSSION

**A. Were Appellant's Statements the Product of an Unlawful Arrest?**

In his first issue, appellant argues his federal constitutional rights, his state constitutional rights, and his statutory rights under the Texas Code of Criminal Proce-

2. It is unclear from the record at what point Tuck returned to the scene.

dure were violated when the trial court failed to suppress his videotaped statements because his statements were the product of an unlawful arrest.[3] According to appellant, the unlawful arrest caused his statements to be involuntary, and therefore, the trial court should have excluded them. Ultimately, appellant's contention hinges on whether appellant was in custody at the time his statements were made.

### 1. Standard of Review

A bifurcated standard of review is applied to a trial court's ruling on a motion to suppress evidence. *See Guzman v. State,* 955 S.W.2d 85, 89 (Tex.Crim. App.1997). An appellate court affords almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's findings are based on an evaluation of credibility and demeanor. *Id.* The appellate court affords the same amount of deference to a trial court's ruling on mixed questions of law and fact if the resolution of those questions turns on an evaluation of credibility and demeanor. *Id.* The court reviews *de novo* those questions not turning on credibility and demeanor. *Id.* At a suppression hearing, the trial court is the exclusive trier of fact and judge of the credibility of the witnesses. *Mason v. State,* 116 S.W.3d 248, 256 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd). If the trial judge's decision is correct under any theory of law applicable to the case, the decision will be sustained. *State v.*

*Ross,* 32 S.W.3d 853, 855–56 (Tex.Crim. App.2000).

### 2. Applicable Law

Appellant argues he was in custody when his videotaped statements were made. A person is in "custody" if, under the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State,* 931 S.W.2d 244, 254 (Tex.Crim.App.1996). The "reasonable person" standard presupposes an innocent person. *Id.* Moreover, the subjective intent of law enforcement officials to arrest is irrelevant unless that intent is somehow communicated or otherwise manifested to the suspect. *Id.* The Court of Criminal Appeals has recognized four factors relevant to determining custody:

(1) Probable cause to arrest,

(2) Subjective intent of the police,

(3) Focus of the investigation, and

(4) Subjective belief of the defendant.

*Id.* However, under *Stansbury v. California,* 511 U.S. 318, 321–24, 114 S.Ct. 1526, 1528–30, 128 L.Ed.2d 293 (1994), factors two and four have become irrelevant except to the extent that they may be manifested in the words or actions of law enforcement officials. *Dowthitt,* 931 S.W.2d at 254. The custody determination must be made on an ad hoc basis, after considering all of the objective circumstances. *Id.* at 255. Stationhouse questioning does not,

---

**3.** Although appellant raises his issue under the United States Constitution, the Texas Constitution, and the Texas Code of Criminal Procedure, he makes no distinction between his rights under each claim. Appellant has failed to provide any argument or authority that the Texas Constitution or the Texas Code of Criminal Procedure provides him greater protection than the United States Constitution. In fact, appellant admits in his brief "[a] plain reading and comparison of the language of

the Fourth Amendment and Art. I, § 9 reveal no substantive differences." Therefore, we will analyze appellant's first issue using federal constitutional principles. *See Johnson v. State,* 853 S.W.2d 527, 533 (Tex.Crim.App. 1992) (declining to address appellant's arguments regarding his state constitutional rights when appellant did not make a distinction between the United States Constitution and the Texas Constitution).

in and of itself, constitute custody. *Id.* Further, custody does not occur merely because the suspect submits to and fails a polygraph test. *Id.* However, the mere fact that an interrogation begins as noncustodial does not prevent custody from arising later; a consensual inquiry can escalate into custodial interrogation. *Id.*

The Court of Criminal Appeals has outlined at least four general situations which may constitute custody: (1) when the suspect is physically deprived of his freedom of action in any significant way, (2) when a law enforcement officer tells the suspect that he cannot leave, (3) when law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, and (4) when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. *Id.* Concerning the first three situations, *Stansbury* indicates the restriction upon freedom of movement must amount to the degree associated with an arrest as opposed to an investigative detention. *Id.* Concerning the fourth situation, *Stansbury* dictates that the officer's knowledge of probable cause be manifested to the suspect. *Id.* Such manifestation can occur if information substantiating probable cause is related by the suspect to the officers. *Id.* Furthermore, situation four does not automatically establish custody; rather, custody is established if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe that he is under restraint to the degree associated with an arrest. *Id.* Based on these rules, we now review the testimony relevant to this issue.

### 3. Relevant Testimony

In reviewing a trial court's ruling, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *Rachal v. State,* 917 S.W.2d 799, 809 (Tex.Crim.App. 1996). This general rule, however, is inapplicable when the parties consensually relitigate the suppression issue during the trial on the merits. *Id.* When the State raises the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant has made an election to reopen the evidence, and consideration of the relevant trial testimony is appropriate in our review. *Id.* In the instant case, both the prosecutor and appellant's attorney asked Rocha and Wienel questions during the trial on the merits regarding the circumstances surrounding the day appellant made his statements. Additionally, appellant renewed his objection made during the pretrial hearing, which the trial court overruled. Subsequently, appellant requested a running objection. We conclude appellant fully participated in the relitigation of the issue during trial; therefore, we will consider the evidence adduced at both the suppression hearing and the trial on the merits. *See id.*

Two days after the offense occurred, Rocha and Phillips participated in the follow-up investigation. The officers did not have probable cause at the time to believe appellant had committed the assault, but they knew he was present the night of the incident and wanted to question him. When Rocha and Phillips arrived at appellant's house, appellant was sitting on his front porch.

Rocha testified they got out of the car, identified themselves to a man in the front yard, and asked if appellant was home. After the man pointed appellant out, the officers walked in appellant's direction, and appellant met them halfway in the yard. Rocha testified he asked appellant "[d]o you know why I am here" and then told him "I'm here to ask you some questions

on an incident that happened at a party Saturday night, Sunday morning." According to Rocha, appellant said "[y]eah, I know why you're here." Rocha testified he asked appellant if he would "be willing to come downtown to 601 Lockwood to answer some questions" because he knew appellant was at the party. According to Rocha, appellant replied "[y]eah, I don't have any problems."

Rocha testified he asked appellant to follow him to the car. Before Rocha put appellant in the vehicle, he placed appellant in handcuffs. Rocha testified he told appellant before putting him in the vehicle "[l]ook, I'm going to put you in the backseat. I'm going to handcuff you prior to putting you in there.... Mainly for officer's safety." According to Rocha, he told appellant he was not under arrest, and he made it clear to appellant the handcuffs were for officer safety. Rocha explained he typically handcuffed people he put in the backseat for safety purposes because his car does not have a cage between the front and back seats.

Rocha also testified after he put appellant into his vehicle, appellant's sister approached him and asked if appellant was under arrest. Rocha told her more than once appellant was not under arrest, but they were taking him down to the police station to ask him some questions. According to Rocha, he told her she could go to the station as well, but she did not go. Rocha testified he was not there to arrest appellant and appellant was never placed under arrest. Rocha also testified if appellant had changed his mind on the way to the station and asked to go home, Rocha "would probably have taken him back to the house." Additionally, Rocha testified if appellant had decided he did not want to talk until he had an attorney, he would have given appellant his business card and taken down appellant's contact information. On cross-examination, Rocha did admit he wanted to take appellant to the police station for questioning instead of questioning him at his house. He also admitted the ride from appellant's house to the police station was approximately thirty miles, and appellant was handcuffed until they reached the station. During the trial on the merits, Rocha testified he removed appellant's handcuffs as soon as appellant got out of the police car.

Rocha was present during the first videotaped statement made by appellant. According to Rocha, Wienel read appellant his rights, appellant seemed to understand his rights, and appellant voluntarily answered Wienel's questions. Rocha testified appellant did not appear intoxicated or impaired when he gave his statements.

Phillips, the other officer who went to appellant's house, testified Rocha explained to appellant why he was there and asked appellant if he would go to the station. Phillips testified appellant voluntarily agreed to accompany the officers to the station, and he testified appellant was not under arrest. Phillips admitted appellant was handcuffed while riding in the car, but he explained they used the handcuffs for the safety of the officers and for the safety of appellant because the car did not have a cage. Phillips also testified Rocha explained to appellant why he was putting him in handcuffs. On cross-examination, Phillips testified it was a matter of procedure to handcuff any person they transported, but he was unable to explain how this procedure was for appellant's safety.

Appellant testified to a slightly different version of the events. According to appellant, he was sitting on his front porch when two officers pulled up in front of his house. Appellant testified the two officers briefly spoke with another young man in the front yard and then headed in appellant's direction. Realizing they were looking for him, appellant met the two officers

in the yard and identified himself. Appellant testified the officers explained they wanted to ask appellant some questions and needed him to accompany them to their car. According to appellant, he asked the officers if he could change his clothes before leaving with them, and the officers would not allow him to do so. However, Rocha testified during the trial on the merits he did not remember appellant asking if he could change his clothes before going to the station.

Appellant testified he walked with the officers to their car, and then the officers placed appellant in handcuffs. Appellant testified he felt as if he had no choice about accompanying the officers to the station, and he felt as if he had no choice about being handcuffed. Appellant also testified the officers never told him he was free to leave. According to appellant, even if he had asked, he did not believe the officers would have released him. On cross-examination, however, appellant admitted the officers told him he was not under arrest and explained they were handcuffing him for safety purposes.

Appellant testified once they arrived at the police station, the officers removed his handcuffs and took him to a room. Appellant testified that Wienel read him his legal warnings at the station, and he admitted one of those warnings said appellant could terminate the interview at any time. Despite being read the warnings, appellant testified he agreed to answer questions in two different interviews.

Wienel also testified regarding the circumstances after appellant arrived at the police station. According to Wienel, the entire interaction between him and appellant was videotaped. Wienel testified he read appellant his *Miranda* rights and asked appellant if he understood his rights. However, Wienel admitted he did not specifically ask appellant if he waived his rights. On cross-examination, Wienel explained he never received an express waiver of rights from appellant, but after reading the admonishments, appellant proceeded to give a statement.

According to Wienel, the beginning of appellant's interview was not very fruitful because appellant claimed he did not remember what happened at the party. In an effort to elicit a response, Wienel made both true and false statements to appellant, and eventually, appellant made some incriminating statements. Wienel testified he did not consider appellant to be under arrest, and if appellant had not made the incriminating statements, he would have been free to leave. Wienel also testified he considered appellant's statements to be voluntary.

### 4. Analysis

■ On appeal, appellant argues a reasonable person would not have believed he was free to leave. Appellant specifically points to the fact he was handcuffed and transported approximately thirty miles and that the officers denied his request to change his clothes before leaving. Appellant places heavy reliance on the United States Supreme Court case *Kaupp v. Texas*, 538 U.S. 626, 123 S.Ct. 1843, 155 L.Ed.2d 814 (2003), and argues the facts in *Kaupp* are "remarkably similar to the instant case." In response, the State argues appellant voluntarily accompanied the officers to the station and his subsequent handcuffing did not transform the accompaniment into an arrest. Furthermore, the State argues *Kaupp* is distinguishable from this case. We agree with the State.

■ First, when a person voluntarily accompanies police officers, who are then only in the process of investigating a crime, to a certain location, and he knows or should know that the police officers suspect he may have committed or may be implicated in committing the crime, we are

unable to hold that under the circumstances such person is in custody. *Dancy v. State*, 728 S.W.2d 772, 778–79 (Tex. Crim.App.1987). Once the circumstances show the person is acting upon the invitation, urging or request of police officers, and not the result of force, coercion or threat, the act is voluntary and the person is not then in custody. *Livingston v. State*, 739 S.W.2d 311, 327 (Tex.Crim.App. 1987).

Here, there was evidence appellant freely left with the officers. According to Rocha, the officers approached appellant and asked "[d]o you know why I'm here? I am here to ask you some questions on an incident that happened at a party Saturday night, Sunday morning." Rocha testified appellant stated "[y]eah, I know why you're here." Rocha also testified he asked appellant if he would "be willing to come downtown to 601 Lockwood to answer some questions" and appellant responded "[y]eah, I don't have any problems." Phillips testified Rocha explained to appellant why he was there and asked appellant if he would go to the station. According to Phillips, appellant voluntarily agreed to accompany the officers. Appellant's testimony was that the officers "said they were going to ask [him] questions and told [him] they needed [him] to come out to the car with them. So [he] walked out to their car and then they handcuffed [him]." While appellant's version is different, the trial court was in the best position to evaluate the credibility of the witness and was free to disbelieve appellant's testimony. *See Mason*, 116 S.W.3d at 256. Accordingly, we find there was sufficient evidence to determine appellant voluntarily accompanied the officers to the police station.

Next, the placing of handcuffs on a defendant does not, in and of itself, automatically mean he is in custody. *See Balentine v. State*, 71 S.W.3d 763, 771 (Tex.Crim.App.2002) (holding appellant was not under arrest when officer placed him in handcuffs because while officer was conducting an investigation into shots being fired, officer learned the suspect had lied in response to previous questions and there was no bulletproof partition between the front and back seat); *Rhodes v. State*, 945 S.W.2d 115, 117–18 (Tex.Crim.App. 1997) (holding appellant was not under arrest because officer handcuffed suspect while his partner was chasing second suspect in a high crime area at night). In the instant case, Rocha testified he told appellant before putting him in the vehicle he was going to handcuff appellant but it was for officer safety and not because appellant was under arrest. Rocha explained he typically handcuffed people he put in the backseat for safety purposes because the car does not have a cage between the front and back seat. Phillips testified Rocha explained to appellant the reason for the handcuffs was for the safety of the officers. In addition, appellant admitted the officers told him he was not under arrest and explained they were handcuffing him for safety purposes. Once appellant arrived at the police station, the officers removed his handcuffs. Considering the totality of the circumstances in this case, we conclude handcuffing appellant based on customary safety concerns, and only for the duration of transport in a car lacking a safety cage, does not show custodial status.

Appellant also argues the officer's refusal to allow him to change his clothes before leaving for the station is indicative of an arrest. According to appellant, he asked the officers if he could change his clothes before leaving with them, and the officers would not allow him to do so. Rocha, however, testified during the trial on the merits he did not remember appellant asking if he could change his clothes before going to the station. Again, the trial court was in the best position to evaluate the

credibility of the witnesses and was free to disbelieve appellant's testimony. *See Mason,* 116 S.W.3d at 256. Accordingly, we do not find that this fact weighs in favor of an arrest.

Finally, we disagree with appellant that *Kaupp v. Texas* is "remarkably similar." In *Kaupp,* the co-defendant implicated Kaupp in the murder of a fourteen-year-old girl. *See Kaupp,* 538 U.S. at 627–28, 123 S.Ct. at 1844–45. The detectives on the case immediately tried to obtain a warrant to question Kaupp but failed; nevertheless, they decided to "get [Kaupp] in and confront him with what [his brother] had said." *Id.* at 628, 123 S.Ct. at 1845. At approximately 3:00 a.m., five officers arrived at Kaupp's house and knocked on his front door. *Id.* Kaupp's father allowed the officers to enter the house. *Id.* Thereafter, Officer Pinkins, accompanied by at least two other officers, went to Kaupp's bedroom, awakened him with a flashlight, identified himself, and said "we need to go and talk." *Id.* Kaupp's only response was "okay." *Id.* Pinkins handcuffed Kaupp in his room and escorted him to the police car without shoes and dressed only in his boxer shorts and a t-shirt. *Id.* The officers never told Kaupp he was not under arrest and never told him he was free to leave. *See id.* On the way to the police station, the officers stopped for five to ten minutes at the location where the victim's body was found, and then they took Kaupp to the sheriff's headquarters. *Id.* The officers took Kaupp to an interrogation room, removed his handcuffs, and advised him of his rights under *Miranda. Id.* Kaupp eventually admitted involvement in the murder. *Id.* at 629, 123 S.Ct. at 1845.

Kaupp unsuccessfully moved to suppress his statements, arguing he was illegally arrested prior to giving the statements, and he was ultimately sentenced to fifty-five years' imprisonment. *Id.* This court affirmed Kaupp's conviction, concluding no

arrest had occurred until after the confession. *Id.* This court held Kaupp consented to go with the officers by answering "okay" and saw no contrary significance to the subsequent handcuffing given that it was a routine safety procedure. *Id.*

The United States Supreme Court granted review of the case and reversed this court's decision regarding whether Kaupp was under arrest at the time of his confession. *Id.* at 632–633, 123 S.Ct. at 1847–48. The Court cited to a test derived from Justice Stewart's opinion in *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), which gave examples of circumstances that might indicate a seizure. *Id.* at 629–30, 123 S.Ct. at 1846. The circumstances include "[the] threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" *Id.* at 630, 123 S.Ct. at 1846 (citing *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877). The Court found there was evidence of every one of the probative circumstances mentioned by Justice Stewart in *Mendenhall. Id.* at 630–31, 123 S.Ct. at 1846.

The Court went on to say under the circumstances, Kaupp's response of "okay" was not a showing of consent, and Pinkins did not offer Kaupp a choice. *Id.* at 631, 123 S.Ct. at 1847. The Court stated "[t]here [was] no reason to think Kaupp's answer was anything more than 'a mere submission to a claim of lawful authority.'" *Id.* (citing *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion)). Furthermore, the Court stated the routine practice of transporting individuals in handcuffs was not as significant as the state court thought. *Id.* at 632, 123 S.Ct. at 1847.

The Court stated "[t]he test is an objective one, . . . and stressing the officers' motivation of self-protection does not speak to how their actions would reasonably be understood." *Id.*

The critical distinction between *Kaupp* and the case sub judice is the consensual and nonthreatening nature of the events beginning with appellant's stroll from the porch to greet the officers. Other distinguishing facts include: (1) the officers arrived at appellant's home at 11:00 in the morning; (2) the officers explained to appellant they had some questions that needed to be answered and asked if he would accompany them to the police station; (3) appellant stated he knew why the officers were there and stated he did not have a problem going with them; (4) after consenting to go with the officers, appellant and the officers walked to the police car at which point Rocha placed handcuffs on appellant and explained to him the handcuffs were only for safety purposes; (5) Rocha informed appellant multiple times he was not under arrest; (6) Rocha told appellant's sister he was not under arrest and told her she could go to the police station with him if she wanted; and (7) the officers removed appellant's handcuffs when they arrived at the police station before taking him to a room.

Here, evidence exists as to only one of the probative circumstances mentioned by Justice Stewart in *Mendenhall*, whereas in *Kaupp*, the Court found evidence of every one of the probative circumstances. *Id.* at 630–31, 123 S.Ct. at 1846; *see Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877. Additionally, as discussed above, the evidence shows appellant voluntarily consented to accompany the officers to the police station. The statements made by Rocha and appellant's responses to those statements are starkly different from the statement and response made in *Kaupp*. Here, the evidence proves appellant's responses were consensual and not a mere submission to a claim of lawful authority.

In the instant case, appellant was handcuffed but, unlike *Kaupp*, he was not handcuffed until after he consented to go with the officers. Also, unlike *Kaupp*, the officers informed appellant repeatedly he was not under arrest and informed him the handcuffs were merely for safety purposes. While the Supreme Court stressed in *Kaupp* the test is objective and an officer's motivation of self-protection does not speak to how his actions would reasonably be understood, we conclude the fact appellant consented before being handcuffed and the fact the officers informed appellant he was not under arrest and was being placed in handcuffs only for safety purposes to be important distinctions between *Kaupp* and the case at hand. We conclude a reasonable person would understand the actions of the officers after being told multiple times the purpose of the handcuffs was not to place him under arrest but for safety purposes.

Based on all of the evidence, we hold the trial court did not abuse its discretion in concluding appellant was not in custody when he gave his videotaped statements. Accordingly, appellant's statements were not the product of an illegal arrest. We overrule appellant's first issue.

## B. Did Appellant Waive his *Miranda* Rights?

In his second issue, appellant argues his federal and state constitutional rights[4] and his statutory rights were violated when the

---

**4.** Once again, because appellant failed to provide any argument or authority that the Texas Constitution provides him greater protection than the United States Constitution, we will analyze appellant's second issue using federal constitutional principles. *See Johnson*, 853 S.W.2d at 533.

trial court denied his motion to suppress the videotaped statements because appellant did not expressly waive his *Miranda* rights. Appellant argues he did not knowingly, intelligently and voluntarily waive his rights on the videotape. The State argues because appellant was never in custody, the interrogation was not a "custodial interrogation," therefore, the officers were not required to read appellant his rights. We agree with the State.

### 1. Applicable Law

Article 38.22 of the Texas Code of Criminal Procedure prohibits the use of oral statements made as a result of custodial interrogation unless, *inter alia* an electronic recording is made of the statement, Miranda warnings are given, and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warnings. *See* Tex.Code Crim. Proc. Ann. art. 38.22 § 3(a)(1)-(2) (Vernon 2005). Article 38.22 codifies both *Miranda's* system of protecting a suspect against self-incrimination and its distinction between voluntary statements and compelled confessions. *See Stahle v. State*, 970 S.W.2d 682, 690 (Tex.App.-Dallas 1998, pet. ref'd). Pursuant to article 38.22, section 5, nothing precludes admission of a statement that is either (1) res gestae of the arrest or offense, (2) *a statement that does not stem from custodial interrogation*, or (3) a voluntary statement, whether or not the result of custodial interrogation. Tex.Code Crim. Proc. Ann. art. 38.22 § 5 (emphasis added). If either the "custodial" or "interrogation" predicates are not met, article 38.22 does not apply. *Gomes v. State*, 9 S.W.3d 373, 379 (Tex.App.-Houston [14th Dist.] 1999, pet. ref'd); *Villarreal v. State*, 61 S.W.3d 673, 680 (Tex.App.-Corpus Christi 2001, pet. ref'd).

### 2. Analysis

Having previously decided appellant was not in custody when he made his videotaped statements, appellant's argument regarding his failure to waive his *Miranda* rights is without merit. Article 38.22 of the Texas Code of Criminal Procedure and appellant's rights under *Miranda* do not apply in this situation. *See Gomes*, 9 S.W.3d at 379; *Villarreal*, 61 S.W.3d at 680; *see also Bass v. State*, 723 S.W.2d 687, 690–91 (Tex.Crim.App.1986) (concluding the legislature intended the term "custodial interrogation" in Article 38.22 to be construed consistently with its meaning under the Fifth Amendment to the United States Constitution).

Assuming, for the purposes of this issue only, appellant was in custody, his argument is still without merit. The record establishes before appellant made his incriminating statements, Wienel read appellant his *Miranda* rights, and appellant indicated he understood his rights. Appellant then proceeded to answer Wienel's questions. It is undisputed appellant failed to expressly waive his rights; however, we hold appellant implicitly waived his rights.

In *Barefield v. State*, the Court of Criminal Appeals held Texas's oral confession statute does not require an express verbal statement from the accused that he waives his rights prior to giving the statement. *Barefield v. State*, 784 S.W.2d 38, 40–41 (Tex.Crim.App.1989), *overruled on other grounds by Zimmerman v. State*, 860 S.W.2d 89 (Tex.Crim.App.1993). The Court determined "[i]n reaching the voluntariness of a confession, [we should look] at the totality of the circumstances." *Id.* at 41. In the present case, Wienel properly advised appellant of his rights on videotape and asked appellant if he understood his rights. Appellant indicated he did understand and then proceeded to answer Wienel's questions. Thus, based on the totality of the circumstances, we hold appellant validly waived his rights under article 38.22. *See Hargrove v. State*, 162

S.W.3d 313, 318–19 (Tex.App.-Fort Worth 2005, pet. ref'd) (finding appellant validly waived his rights despite the lack of an explicit waiver); *State v. Oliver*, 29 S.W.3d 190, 193 (Tex.App.-San Antonio 2000, pet. ref'd) (finding despite the lack of an explicit waiver, appellant knowingly, intelligently, and voluntarily made a statement after reading his rights, indicating he understood them, and proceeding without hesitation to discuss circumstances surrounding the murder with which he was charged).

■ Under a constitutional analysis the answer remains the same. The lack of an express waiver by appellant of his Miranda rights does not, in and of itself, render the oral confession inadmissible. *Faulkner v. State*, 727 S.W.2d 793, 797 (Tex.App.-Houston [14th Dist.] 1987, pet. ref'd) (citing *Harville v. State*, 591 S.W.2d 864, 866 (Tex.Crim.App.1979)). Rather, waiver is to be judged based on the totality of the circumstances. *Id.* Again, based on the totality of the circumstances, we hold appellant validly waived his rights under the United States and Texas constitutions. We overrule appellant's second issue.

## C. Did the Trial Court Abuse its Discretion in Admitting the Expert Testimony of Officer Carrizal?

■ In his third issue, appellant argues the trial court erred in admitting the expert testimony of Officer Carrizal regarding blood spatter. Appellant contends Carrizal was not qualified to give expert testimony pertaining to blood spatter.[5]

### 1. Standard of Review

■ We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion. *Ellison v. State*, 201 S.W.3d 714, 723 (Tex.Crim.App. 2006). A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement. *Casey v. State*, 215 S.W.3d 870, 879 (Tex.Crim.App.2007).

### 2. Applicable Law

■ Rule 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." Tex.R. Evid. 702. Pursuant to Rule 702, the trial court, before admitting expert testimony, must be satisfied that three conditions are met: (1) that the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) that the subject matter of the testimony is appropriate for expert testimony; and (3) that admitting the expert testimony will actually assist the fact finder in deciding the case. *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex.Crim.App.1995). The proponent of the expert testimony bears the burden of proving the expert's qualifi-

---

**5.** Appellant also argues the State failed to meet its burden in proving the expert testimony regarding blood spatter was reliable; however, appellant did not object at trial to Carrizal's testimony on the ground that it was unreliable. Appellant only objected to Carrizal's testimony on the ground he was not qualified. Appellant's objection was insufficient to apprise the trial court or the State that he was challenging the reliability of the evidence as well; therefore, appellant has waived any argument regarding reliability. *See* Tex.R.App. P. 33.1(a); *Vela v. State*, 209 S.W.3d 128, 131 (Tex.Crim.App.2006) (stating the qualifications of a witness as an expert are distinct from reliability and relevance and, therefore, should be evaluated independently); *Nations v. State*, 944 S.W.2d 795, 799 (Tex. App.-Austin 1997, pet. ref'd) (holding the State waived any complaint on appeal about the reliability of an expert's opinion because it only objected to relevancy during the trial).

cations. *Perez v. State*, 113 S.W.3d 819, 832 (Tex.App.-Austin 2003, pet. ref'd).

### 3. *Analysis*

 During the guilt/innocence phase of the trial, the State elicited testimony from Carrizal regarding blood spatter on Tuck's pants and asked Carrizal, based on the pattern, what type of blood transfer had occurred. Appellant objected and conducted a voir dire examination of Carrizal regarding his qualifications. The trial court overruled the objection and Carrizal testified the spatter on Tuck's pant leg was impact spatter and was consistent with someone kicking a bloody object with his foot.

 The specialized knowledge which qualifies a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things. *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex.Crim.App.2000). Carrizal testified he had been a deputy with the Harris County Sheriff's Department for eight years and had been a member of the crime scene unit for three years. He testified there are three levels of blood spatter training. Carrizal testified he had completed and was certified in level one training in blood spatter analysis. Carrizal also testified level one certification required forty hours of classes over the course of one week. Carrizal, however, did admit he had never testified as an expert on this subject before. Based on this evidence, we conclude Carrizal was qualified to give expert testimony regarding blood spatter. *See Holmes v. State*, 135 S.W.3d 178, 183–84 (Tex.App.-Waco 2004, no pet.) (holding an officer who had received level one training in blood spatter analysis and had read books on blood spatter analysis was qualified to testify as an expert).

 Furthermore, even assuming Carrizal was not qualified to testify as an expert, appellant failed to allege harm in his brief, and we find no harm. Texas Rule of Appellate Procedure 44.2(b) provides any error, other than constitutional error, that does not affect substantial rights must be disregarded. Tex.R.App. P. 44.2(b). The erroneous admission of evidence is not a constitutional error. *See Johnson v. State*, 967 S.W.2d 410, 417 (Tex.Crim.App.1998). Substantial rights are not affected "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Id.* Thus, we must determine whether the error had a substantial or injurious effect on the jury's verdict. *Morales v. State*, 32 S.W.3d 862, 867 (Tex.Crim.App.2000). In assessing the likelihood that the jury's decision was adversely affected by the error, we consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how it might be considered in connection with other evidence in the case. *Id.* We may also consider the jury instruction given by the trial judge, the State's theory and any defensive theories, closing arguments, and even voir dire, if material to appellant's claim. *Id.*

Considering the record as a whole, it may be said with fair assurance Carrizal's testimony did not influence the jury or had but slight effect on the jury's punishment verdict. Tex.R.App. P. 44.2(b). Carrizal testified about the blood spatter pattern on Tuck's pant leg, and stated, in his opinion, it was consistent with someone kicking a bloody object with his foot. This testimony merely indicated that Tuck, not appellant, kicked the complainant. Thus, assuming it was error to admit Carrizal's testimony, the error was harmless. *See id.* We overrule appellant's third issue.

### D. Did the Trial Court Err in Admitting into Evidence State's Exhibits 80 through 84?

 In his fourth issue, appellant challenges the trial court's admission of evidence, arguing the evidence was not properly identified or properly linked to appellant. Appellant contends State's exhibits 80 through 84, which consisted of a rape kit, the victim's outer clothing, changing paper from the hospital, and an EMS transfer sheet, had no relevant connection to the case or appellant and therefore was erroneously admitted. The State moved to offer exhibits 80 through 84 into evidence during the testimony of Deputy Hooper. Appellant requested, and was allowed, to question the witness on voir dire to assess whether a proper foundation had been laid to determine the identification of the State's exhibits. After questioning, appellant objected to the exhibits based on an improper foundation. The trial court overruled the objection and admitted the evidence. However, even assuming, without deciding, the trial court abused its discretion in admitting State's exhibits 80 through 84, we hold the error, if any, is harmless.

#### 1. Applicable Law

The applicable rules regarding a harm analysis in this issue are the same as previously discussed in issue number three. *See* Tex.R.App. P. 44.2(b).

#### 2. Analysis

While alleging error, appellant failed to allege any harm, and after reviewing the entire record, we find no harm in the admission of the exhibits. The evidence appellant argues was improperly admitted did not implicate the appellant in the commission of the crime; the items were merely identified as items belonging to the victim or items the victim had come in contact with at the hospital. Given the record before us, we conclude the error, if any, in the admission of State's exhibits 80 through 84 did not influence the jury, or had only a slight effect. We overrule appellant's fourth point of error.

#### CONCLUSION

Having overruled all four of appellant's issues, we affirm the trial court's judgment.