

## NUMBER 13-07-332-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

THE STATE OF TEXAS,                                                      Appellant,

v.

LUIS AGUILAR,                                                          Appellee.

On appeal from the 28th District Court
of Nueces County, Texas

## MEMORANDUM OPINION

Before Justices Rodriguez, Garza, and Vela
Memorandum Opinion by Justice Vela

The State appeals the trial court's order granting Luis Aguilar's motion to suppress his video-taped statements. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (Vernon Supp. 2008).[1] By one issue, the State asserts the trial court erred in granting the motion to suppress. We reverse and remand.

## I. Background

On the morning of November 5, 2006, Jose Mosqueda was stabbed to death on Mohawk Street in Corpus Christi. About twelve hours later, the suspect in the slaying, Luis Aguilar, was arrested and taken to an interview room at the Corpus Christi Police Department. The interview room was equipped with a video camera that recorded the events[2] in the interview room. Detective R. L. Garcia gave Aguilar a document[3] entitled

---

[1] The State may appeal an order that "grants a motion to suppress evidence, a confession, or an admission, if jeopardy has not attached in the case and if the prosecuting attorney certifies to the trial court that the appeal is not taken for the purpose of delay and that the evidence, confession, or admission is of substantial importance in the case[.]" TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (Vernon Supp. 2008).

[2] The interview between Detective Garcia and Aguilar was conducted in Spanish. An English-language translation of the interview was admitted into evidence at the suppression hearing. In relevant part, the translation stated:

Officer Garcia: Mr. Aguilar . . . before I talk to you. . .

Aguilar: Un-huh.

Officer Garcia: I have to give you your warnings okay.

         * * *

Officer Garcia: [R]ead me this, what does it say in Spanish read me that.

Aguilar: It says you have the right to remain silent you don't have to give any statement. Anything you say can be, can be it says and will be used as evidence against you in court it says.

Officer Garcia: Wait do you understand that right?

Aguilar: Yes.

Officer Garcia: Okay put your initials there put your name here on top also put your initials.

"ADVISO DE MIRANDA," which contained the *Miranda*[4] warnings in Spanish.  Aguilar read

Aguilar: Only my initials?

Officer Garcia: Initials okay.  What is the second right here?

Aguilar: You have the right to hire an attorney have him present with you before and during a whatever interrogation which [sic] peace officers detectives or attorneys for the state. . . .

Officer Garcia: Okay put your initials.  You do understand that right?

Aguilar: Uh huh.

Officer Garcia: Okay let's go to the third one.

Aguilar: If you don't have the means to hire an attorney you have the right that the court assign you one without payment it says to represent you before and advise you before and during any interview.

Officer Garcia: Do you understand?  Put your initials again.  The same thing next.

Aguilar: If you permit any peace officer or attorney for the state ask you questions with or without your attorney representatives you still have the right to deny answering and put an end to the questions.

Officer Garcia: Here.

Aguilar: You have the right to an examining trial a hearing in front of a judge to determine if the state has enough evidence to hold you or according to the law or be set free without any charges.

Officer Garcia: Do you understand your rights?

Aguilar: Do you understand your rights, yes.

Officer Garcia: Put a circle on the word yes a circle.  Put your initials here.  Okay put the date here and it is eleven 5 November fifth.

Aguilar: I put 11.

Officer Garcia: 11, 5.

Aguilar: 11, 5.

Officer Garcia: 06 okay put your name right here.  Okay here is where it goes.  It is Luis Arturo, right?

Aguilar: Yes.

[3]At the suppression hearing, the trial court admitted this document into evidence as defendant's exhibit 1.

each warning out loud, told Detective Garcia he understood them, and put his initials by each warning. Following these warnings, the document states: "Entiende sus derechos? Si __ No __," which means, "Do you understand your rights? Yes__ No__." Aguilar circled the Spanish word, "Si," and he put his initials in the blank following "Si." After Aguilar and Detective Garcia signed the document, Aguilar told him about the stabbing incident. Afterwards, Aguilar agreed to take Detective Garcia to where he had hidden the knife. At this point, the videotape ends. It restarts when Aguilar and Detective Garcia return to the interview room. Detective Garcia showed Aguilar the knife, and Aguilar identified it as the knife he used to stab Mosqueda.

Aguilar was indicted for Mosqueda's murder by stabbing him with a knife. On February 27, 2007, defense counsel filed a motion to suppress evidence, asserting that Aguilar was given his *Miranda* warnings as required by law; however, he never made a knowing, intelligent, or voluntary waiver of his rights as required by article 38.22, section 3 of the code of criminal procedure. Aguilar claims that his videotaped statements were therefore involuntarily made and any evidence obtained as a result thereof is inadmissible. Specifically, Aguilar claims that the knife allegedly used in this case, its location, and the fact that Aguilar took the police to the knife are inadmissible because the evidence was obtained in violation of articles 38.22 and 38.23 of the code of criminal procedure, the Fourth and Fourteenth Amendments to the United States Constitution, and the Texas Constitution.[5]

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

[5] Aguilar does not specify what article or section of the Texas Constitution to which he is referring.

4

On April 27 and 30, 2007, the trial court held a hearing on the motion to suppress. Before the court heard any evidence, the State's attorney and defense counsel agreed[6] to narrow the issue to whether Aguilar knowingly, intelligently, or voluntarily waived his rights as required under article 38.22 of the code of criminal procedure.

## II. Standard of Review

"The job of an appellate court in cases" of motions to suppress evidence "is to review the decision of the lower court for an abuse of discretion." *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006) (op. on orig. submission). "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *Id*.; *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000); *see De La Rosa v. State,* 658 S.W.2d 162, 167 (Tex.

---

[6]Specifically, the parties told the trial court:

State:  And for the purpose of this hearing, I think it would benefit everybody if we narrow the issue. I read his [defense counsel's] motion [to suppress] as complaining of the actual Miranda warnings given to the defendant [Aguilar], whether those were—actually, whether the defendant affirmatively waived his rights as given to him by the detective. I'm not sure if that is the only issue that Mr. Del Toro [defense counsel] is complaining about. I just want to narrow down the issues and save time here.

Counsel:  I agree, Your Honor. The Court is well aware Article 38.22, Section 3, talks about cases where oral statements are taken and recorded. And the States are required to preserve that recording. And prior to the statement being given or during the recording, the article requires that certain warnings should be given to the defendant, otherwise known as the Miranda warnings. In addition, it says the accused must knowingly, intelligently, and voluntarily waive any rights as set out in the warnings.

I perceive that my client was given some warnings, Your Honor, or—I think they do meet the requirements under the statute. I will let the Court decide that. But my main concern is whether there was a waiver of any of his rights as required under 38.22, Your Honor. And we are saying there was no knowing, intelligent, or voluntary waiver of such rights by the defendant in this case. . . .

Court:  All right. That, in essence, is the issue I see here.

5

Crim. App. 1983); *Montgomery v. State,* 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g). "We will sustain the lower court's ruling if it is reasonably supported by the record and is correct on any theory of law applicable to the case." *Dixon,* 206 S.W.3d at 590*; Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990). "We give almost total deference to a trial court's express or implied determination of historical facts and review *de novo* the court's application of the law . . . to those facts." *Dixon*, 206 S.W.3d at 590 (citing *State v. Ross,* 32 S.W.3d 853, 856 (Tex. Crim. App. 2000)); *accord Guzman v. State,* 955 S.W.2d 85, 88 (Tex. Crim. App. 1997). "[G]reat deference is accorded to the trial court's decision to admit or exclude such evidence, which will be overturned on appeal only where a flagrant abuse of discretion is shown." *Delao v. State*, 235 S.W.3d 235, 238 (Tex. Crim. App. 2007)*.*

"[T]he trial court is the 'sole and exclusive trier of fact and judge of the credibility of the witnesses' and the evidence presented at a hearing on a motion to suppress, particularly when the motion is based on the voluntariness of a confession." *Id*. (footnote omitted). The determination of whether a statement is voluntary is a mixed question of law and fact; that is, an application of law to a fact question. *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000). We review de novo those questions not turning on credibility and demeanor. *Id*.

In evaluating the voluntariness of confessions, a trial court is required to examine the totality of the circumstances surrounding them. *See Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991); *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Delao*, 235 S.W.3d at 241; *Creager v. State*, 952 S.W.2d 852, 856 (Tex. Crim. App. 1997).

6

III. Suppression Hearing

*A. Luis Aguilar's Testimony*

Aguilar, a twenty-eight-year-old El Salvadoran native, testified he can read and write Spanish, but he cannot read or write English.[7] He has lived continuously in the United States since September 18, 2005. Defense counsel showed Aguilar the document containing the *Miranda* warnings, which was admitted into evidence as defendant's exhibit 1. When counsel asked Aguilar to read the document's first paragraph, Aguilar responded, "You have the right to remain silent. You don't have to give any statement. Anything you say can be used against you, as evidence against you in court." He testified that he told Detective Garcia he understood this right. When counsel asked Aguilar what the first paragraph meant, he replied:

A.      That I don't have to talk in court. I have to remain silent.

Q.      That you have to remain silent?

A.      Yes.

Q.      Or does it say that you may remain silent?

A.      Yes.

Q.      And what did that signify or mean to you?

A.      I don't know.

Q.      Do you know what that meant when it said, in a court?

A.      No.

Q.      Why did you tell the officer that you understood what you had read?

---

[7]Luis Aguilar testified through a sworn interpreter.

A.  I didn't know.

Q.  You didn't know what?

A.  I didn't know what was going on.

When counsel asked Aguilar to read the document's second paragraph, he responded, "You have the right to hire an attorney." He testified that he understood what this meant. When counsel asked him what it meant, he replied, "It means that I had the right to ask for an attorney if I didn't have the money to get one."

When counsel asked Aguilar to read the third paragraph, he replied, "If you don't have the means to hire an attorney, you have the right for the Court to find you one without any payment so that he can represent you before and during any interview." When counsel asked Aguilar, "What did you understand it to mean?", he said, "I don't know." However, Aguilar testified he was familiar with the concept of what it means to hire a lawyer, but he denied knowing how to get a court to assign a lawyer to him.

When counsel asked Aguilar to read the next paragraph, he replied, "If you permit for any official—any peace officer or attorney from the State to ask you questions without an attorney being present, you still have the right to stop the answers and stop—deny answering, and put an end to the questions." He testified that he did not know what this meant. When counsel asked him, "What do you think it means?", he replied, "I don't know." At that point, counsel asked him:

Q.  When it says here that if you permit any official of the peace—what does that mean to you, official of the peace?

A.  A police officer.

Q.  And where it says, or attorney of the State, what is that to you?

8

A. Like an attorney like you.

Q. Do you think I'm an attorney for the State?

A. No, I don't know.

Q. But the paper says, or an attorney of the State, correct?

A. Yes.

Q. [W]hat does that mean to you, those words?

A. I don't know.

Q. When it says here that you have the right to stop the questioning, do you know what that means?

A. No.

Q. Do you know what questions it's referring to?

A. Yes.

At this juncture, counsel told the court he thought the interpretation "was a little bit off" and repeated the question:

Q. When you read that, do you know what questions that paragraph was referring to?

A. Maybe.

Q. You're not sure?

A. No.

Q. What do you think it means?

A. Well, maybe I think what it meant, that if the police officer caught me, that I didn't have to answer.

Q. So you understood that back then?

A. Yes.

When counsel asked Aguilar to read the last paragraph, he replied, "You have the right to have an examining trial." He testified that he did not know what that meant. Counsel then told him:

Q. Continue reading.

A. A hearing before a judge.

Q. Do you know what that is? What does that mean to you?

A. I think that is what we are doing right now.

Q. Continue.

A. To determine if the State has enough evidence.

Q. Do you understand what that means?

A. Yes.

Q. Continue.

A. To detain you and continue according to the law, or to be set free according—or to be set free without any charge.

Q. Do you understand what that meant?

A. Yes.

Aguilar stated that when he initialed and signed the document, no one asked him if he wanted to give up any rights that he had. When counsel asked him, "Did you know at that time that if you signed that document, it might mean that you were giving up whatever rights you had under the law here in the United States?", he replied, "No, I didn't know." Aguilar answered "No" when counsel asked, "So did you feel that you had to answer the questions?" Aguilar testified he answered the questions because he wanted to. However, he said that at the time he talked to Detective Garcia, he did not understand

what the document said.  Counsel further questioned Aguilar as follows:

Q.     What do you think would have happened if you told him [Detective Garcia], no, I don't want to put my initials there?

A.     I don't know.

Q.     Did that thought cross your mind when he told you to put your initials there?

A.     Yes.

Q.     What were you thinking at that point?

A.     He just told me to read it and for me to put my initials on the little line.

Q.     But didn't he also ask you if you understood as you were putting your initials on there?

A.     Yes.

Q.     And did you indicate to him that you understood?

A.     Yes.

Q.     But now you are telling us that you didn't really understand?

A.     Yes, I just read it and I put my initials.

On cross-examination, Aguilar testified that he is able to read and write Spanish, understand what he reads in Spanish, and express himself in Spanish.  He testified that he was able to read defendant's exhibit 1 and that he placed his initials by each warning, circled "Si" where the document asked if he understood his rights, and wrote his initials on the line following the word "Si."  When the State's attorney asked him, "And so by that, you were saying you understood these rights, correct?", he replied, "Yes."  The State's attorney questioned him as follows:

Q.     And you did understand what you read, didn't you?

* * *

A. No.

Q. Then why did you say that you did understand?

A. I don't know.

Q. Are you saying that you understood the words but you didn't really understand what it meant?

A. Yes.

Q. But you definitely told Detective Garcia that you did understand these rights, correct?

A. Yes, that I understood the paper, but I didn't know what I was doing.

He testified that he told Detective Garcia he did know what he was doing, that he was willing to talk to him, that nobody told him what to say, and that Detective Garcia did not force him to talk. The State's attorney continued:

Q. Mr. Aguilar, if Detective Garcia did not force you to give him a statement, would you agree with me that you gave that statement voluntarily?

A. Yes.

Q. And you gave that statement voluntarily after reading [defendant's exhibit 1]?

A. Yes.

Q. And after telling Detective Garcia that you understood everything in [defendant's exhibit 1]?

A. Yes.

Q. And in [defendant's exhibit 1] you told Detective Garcia that you understood what your rights were, correct?

A. Yes.

12

* * *

Q.      What I'm asking you is, once you started telling Detective Garcia about what had happened earlier that morning between you and Jose Mosqueda, at any point in your own mind did you want to stop?

A.      No.

Q.      Did you want to tell Detective Garcia what had happened?

A.      Yes.

Aguilar testified he voluntarily told Detective Garcia he had hidden the knife and voluntarily took him to the knife's location. At no time did he tell Detective Garcia he wanted to talk to a lawyer. The State's attorney continued questioning him as follows:

Q.      Mr. Aguilar, after reading this document, defendant's exhibit 1, you understood what it said, correct?

A.      No, I didn't understand—I understand what it was saying, but not what it contained.

Q.      You understand the words?

A.      Yes, I did understand the words; but I didn't understand what it contained.

Q.      Well, we talked earlier about the fact that you're able to read very well in Spanish.

A.      Yes.

Q.      So then can you explain how it was that you were able to read the words and not understand what they meant?

A.      Well, what had happened, I didn't know that it was—what happened in the morning that day, I didn't think the same way I'm thinking right now.

Q.      You mean, you weren't thinking clearly—

A.      No.

13

Q.     —because of what had happened earlier in the day?

A.     Yes.

Q.     But normally you would be able to understand what it meant, correct?

A.     Yes.

Q.     If you were thinking more clearly, correct?

A.     Yes.

Aguilar testified that he wanted to tell Detective Garcia what he had done and that he wanted to confess to him.

*B. Testimony of Detective R. L. Garcia*

Detective Garcia testified that while in the interview room, he "went over his [Aguilar's] Miranda rights in Spanish" and that Aguilar indicated to him that he understood his rights.[8] Detective Garcia identified defendant's exhibit 1 as the Spanish-language

---

[8]With respect to the *Miranda* rights, the State's attorney questioned Detective Garcia as follows:

Q.     So you had him read the first paragraph and then you asked him if he understood?

A.     Yes. I had him read each paragraph or each right, again asked him if he understood it. He indicated with initials in each and every one of them that he did understand. And there is a deal in the bottom there where if says--where he circles and put his initials, do you understand your rights. And then we go a little further down, the date, 11/5/06, and the accused means Luis Arturo Aguilar. And that is his signature there.

     * * *

Q.     So in the interview room prior to asking Mr. Aguilar any questions and prior to getting him to speak about the actual crime that he was being investigated for, did you make sure that he was aware or at least he read that he had the right to remain silent?

A.     Yes, he did.

Q.     And that he had the right not to make a statement at all and that any statement could be used against him at trial?

A.     Yes, sir.

Q.     And you were satisfied by the fact that he was able to read that back to you and affirmatively said that he understood it?

14

A.    Yes.

Q.    And he was able to indicate to you that he understood that he had the right to a lawyer?

A.    Yes.

Q.    And that he had a right to this lawyer to be present to advise him prior to and during any questioning?

A.    Yes.

Q.    And you were satisfied that Mr. Aguilar understood that if he was unable to employ a lawyer that he could have a lawyer appointed to advise him prior to and during any questioning?

A.    Yes, I was.

Q.    And you were satisfied that Mr. Aguilar understood that he had a right to terminate the interview at any time?

A.    Yes.

Q.    And you were satisfied that because of the fact that he was able to read these statements back to you in Spanish and indicate to you that he did understand. Is that right?

A.    That's correct.

Q.    And in addition to indicating verbally that he understood them, he placed his initials beside each of those on that document, defense exhibit 1. Is that correct?

A.    That's correct.

Q.    And in addition to that he was able to read the line that said he understood his rights and he circled, si, or yes, and also placed his initials. Is that correct?

A.    That's correct.

On re-direct examination, the State's attorney asked Detective Garcia:

Q.    Detective Garcia, did you cover all the warnings required under Article 38.22, Miranda warnings with the Defendant?

A.    Yes, I did.

Q.    And he indicated to you affirmatively that he understood each of them?

A.    He did, twice.

Q.    He did so verbally, correct?

A.    Yes.

15

*Miranda* warnings that he gave to Aguilar. Detective Garcia also testified Aguilar "did not appear to be under the influence of anything" and that Aguilar was neither coerced, threatened, nor promised anything in return for his confession. He stated Aguilar never asked for an attorney and did not ask to terminate the interview. After the interview, Aguilar agreed to take him to where he had hidden the knife. They went to the crime scene where Aguilar pointed out the direction he went after the murder. He told Detective Garcia he had thrown the knife "in a manhole" and took him to the manhole, where the knife was recovered. After Detective Garcia retrieved the knife, he took Aguilar back to the interview room. He restarted the videotape and showed Aguilar the knife. Aguilar said it was the knife he had used in the stabbing.

After hearing the evidence and counsel's arguments, the trial court granted the motion to suppress, stating, "The Court has considered the case law and the statute involved. The Court is going to grant the motion to suppress." On May 16, 2007, the trial court signed the "ORDER ON DEFENDANT'S MOTION TO SUPPRESS," which stated, in relevant part: "Based on the evidence presented, the Court finds that the Defendant did not voluntarily, knowingly, and intelligently waive his rights." No findings of fact or conclusions of law signed by the trial court were filed in this case.

IV. Applicable Law & Analysis

Article 38.21 of the code of criminal procedure provides that "[a] statement of an

---

Q.    And he did so by placing his initials by each of the rights themselves, correct?

A.    That's correct.

Q.    And also affirmatively by circling yes to the line that said you understand your rights, correct?

A.    That's correct.

16

accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21 (Vernon 2005). A defendant may claim his or her statement was not freely and voluntarily made under several different theories: (1) article 38.22, section 6—general voluntariness;[9] (2) *Miranda v. Arizona*, as expanded in article 38.22, sections 2 and 3; or (3) the Due Process Clause of the Fourteenth Amendment. *Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008). A statement may be involuntary under one, two, or all three theories. *Id.*

*A. Claims of Involuntariness Under the Due Process Clause and Miranda*

Constitutional due process requires that a confession must have been voluntarily given before it may be admitted into evidence. *Michigan v. Harvey*, 494 U.S. 344, 350 (1990); *Jackson v. Denno*, 378 U.S. 368, 376 (1964); *Smith v. State*, 779 S.W.2d 417, 427 (Tex. Crim. App. 1989).[10] A confession may be involuntary under the Due Process Clause only when there is police overreaching.[11] *Oursbourn,* 259 S.W.3d at 169; *see Alvarado v.*

---

[9]Section 6 of article 38.22 provides that only "voluntary" statements may be admitted. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 2005).

[10]Echoing this dictate, article 38.23 of the code of criminal procedure states: "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." TEX. CODE CRIM. PROC. ANN. art. 38.23 (Vernon 2005).

[11]Statements that have been found to be involuntary under *Miranda* or the Due Process Clause were collected in *Colorado v. Connelly*, 479 U.S. 157, 164 n.1 (1986). They involve the crucial element of police overreaching and involve fact scenarios such as the following: (1) the suspect was subjected to a four-hour interrogation while incapacitated and sedated in an intensive-care unit. *Mincey v. Arizona*, 437 U.S. 385 (1978); (2) the suspect, while on medication, was interrogated for over eighteen hours without food, medication, or sleep. *Greenwald v. Wisconsin*, 390 U.S. 519 (1968); (3) the police officers held a gun to the head of the wounded suspect to extract a confession. *Beecher v. Alabama*, 389 U.S. 35 (1967); (4) the police interrogated the suspect intermittently for sixteen days using coercive tactics while he was held incommunicado in a closed cell without windows and was given limited food. *Davis v. North Carolina*, 384 U.S. 737 (1966); (5) the suspect was held for four days with inadequate food and medical attention until he confessed. *Beck v. Pate*, 367 U.S. 433 (1961); (6) the suspect was subjected to five days of repeated questioning during which police employed coercive tactics. *Culombe v. Connecticut*, 367 U.S. 568 (1961);

*State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1999) (noting that a statement is involuntary under federal due process "only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker"); *see also Connelly*, 479 U.S. at 167 ("We hold that coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."). Even if a confession is not the product of a meaningful choice (for example, when it is made in response to hallucinations or to a private person's threat), it is nonetheless voluntary within the meaning of the Due Process Clause absent some coercive police activity.[12] *Oursbourn*, 259 S.W.3d at 169-70 ("Absent police misconduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process of law."). The Due Process Clause is aimed at protecting suspects from police overreaching, not at protecting individuals from themselves or other private actors. *Id*. The same is true for *Miranda* rights and waivers that apply to custodial-interrogation statements. *Id*. "*Miranda* protects defendants against government coercion leading them to surrender rights protected by the Fifth Amendment; it goes no further than that." *Id*. at 170.[13]

---

(7) the suspect was held incommunicado for three days with little food, and the confession was obtained when officers informed him that their chief was preparing to admit a lynch mob into the jail. *Payne v. Arkansas*, 356 U.S. 560 (1958); and (8) the suspect was questioned by relays of officers for thirty-six hours without an opportunity for sleep. *Ashcraft v. Tennessee*, 322 U.S. 143 (1944).

[12]The Supreme Court made this clear in *Connelly*, when it held that if there is no police coercion or overreaching, there is no due-process violation–even if a suspect is suffering from chronic schizophrenia and is in a psychotic state following the "voice of God" at the time he confesses. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986).

[13]In *Connelly*, the defendant approached a Denver police officer and said that "he had come all the way from Boston to confess to the murder of Mary Ann Junta, a young girl whom he had killed in Denver sometime during November 1982." *Colorado v. Connelly*, 479 U.S. 157, 160 (1986). Unbeknownst to the

18

Thus, in deciding whether Aguilar's statements were involuntary under the Due Process Clause, it was incumbent on the trial court to determine whether his statements were given voluntarily or were the product of police overreaching. The essential question for the trial court to determine was "whether [Aguilar's] will was overborne by the circumstances surrounding the giving of [the] confession[s]," *Dickerson v. United States*, 530 U.S. 428, 434 (2000), and our task on appeal is to determine whether the trial court abused its discretion in resolving that question. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002).

*Analysis*

Here, there is no indication either in the videotape or in the testimony at the suppression hearing that any officer threatened, coerced, or promised Aguilar anything in exchange for his statements. Nothing in the interaction between Aguilar and Detective Garcia suggested Aguilar's will was "overborne" by the circumstances surrounding the statements. During the interviews, Aguilar was not deprived of food, beverage, or the opportunity to visit the restroom. Upon examining the totality of the circumstances surrounding the statements, we hold Aguilar's statements were not the product of police overreaching. Therefore, the statements were not involuntary under the Due Process Clause. *See Dickerson,* 530 U.S. at 434; *Oursbourn,* 259 S.W.3d at 169; *Alvarado,* 912 S.W.2d at 211. Accordingly, the trial court abused its discretion in resolving this question against the State.

police (who scrupulously followed the mandates of *Miranda*), the defendant was apparently obeying the "voice of God" which had instructed him "to withdraw money from the bank, to buy an airplane ticket, and to fly from Boston to Denver." *Id*. at 161. Even though the evidence showed that the defendant was suffering from "command hallucinations that interfered with his volitional abilities; that is, his ability to make free and rational choices" and "he wasn't capable of making a 'free decision' to waive his *Miranda* rights," his confession was not involuntary under the Fifth Amendment. *Id*. at 161-64, 169-71.

19

*B. Claims of Involuntariness under Article 38.22*

The Constitution leaves voluntariness claims based on the defendant's state of mind "to be resolved by state laws governing the admission of evidence." *Oursbourn,* 259 S.W.3d at 170. In Texas, that state law is article 38.22 of the code of criminal procedure. *Id.* Article 38.22 prohibits the use of oral statements made as a result of custodial interrogation unless, *inter alia*, an electronic recording is made of the statement, *Miranda* warnings are given, and the accused knowingly, intelligently, and voluntarily waived any rights set out in the warnings. *Turner v. State*, 252 S.W.3d 571, 583 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd); *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(1)-(2) (Vernon 2005).

Article 38.22 is aimed at protecting people from police overreaching. *Oursbourn*, 259 S.W.3d at 172. But section 6 of that article may also be construed as protecting people from themselves because the focus is upon whether the accused voluntarily made the statement. *Id.* Inquiries about whether a statement was freely and voluntarily made without compulsion or persuasion,[14] or, in the case of a custodial-interrogation statement, whether the suspect "knowingly, intelligently, and voluntarily" waived the rights set out in article 38.22, sections 2(a)[15] or (3)(a),[16] do not turn solely on police overreaching.

---

[14]Article 38.21 of the code of criminal procedure provides, "A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed." TEX. CODE CRIM. PROC. ANN. art. 38.21 (Vernon 2005)..

[15]Section 2 of article 38.22 provides:

> No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:
>
> (a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:

*Oursbourn*, 259 S.W.3d at 172. The behavior of the police may or may not be a factor. *Id*. A confession given under the duress of hallucinations, illness, medications,[17] or even a private threat, for example, could be involuntary under articles 38.21 and 38.22.[18] *Id*.

Under articles 38.21 and 38.22 and their predecessors, fact scenarios that can raise a state-law claim of involuntariness include the following: (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary;[19] (2) the suspect was mentally retarded and may not have "knowingly, intelligently and voluntarily" waived

---

> (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial; (2) any statement he makes may be used as evidence against him in court; (3) he has the right to have a lawyer present to advise him prior to and during any questioning; (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and (5) he has the right to terminate the interview at any time; and (b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section.

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (Vernon 2005).

[16]Section 3(a) of article 38.22 provides:

> No oral or sign language statement of an accused made as a result of custodial interrogation shall be admissible against the accused in a criminal proceeding unless . . . (2) prior to the statement but during the recording the accused is given the warning in Subsection (a) of Section 2 above and the accused knowingly, intelligently, and voluntarily waives any rights set out in the warning. . . .

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3 (Vernon 2005).

[17]*See, e.g., Rocha v. State*, 16 S.W.3d 1, 19-20 (Tex. Crim. App. 2000) (providing that the trial court's general jury instruction under articles 38.21 and 38.22 concerning voluntariness of statement sufficed for jury to consider any evidence of his illness and medication; no error in denying instruction that specifically mentioned illness and medication as that would be a comment on the weight of the evidence).

[18]This has long been the case in Texas. *See Cain v. State*, 18 Tex. 387, 389-90 (1857) ("Before confessions can be received in evidence in a criminal case, it must be shown that they were voluntary. They must not have been obtained by the influence of hope or fear, applied by a third person to the prisoner's mind.").

[19]*Rocha v. State*, 16 S.W.3d 1, 20 (Tex. Crim. App. 2000).

21

his rights;[20] (3) the suspect "lacked the mental capacity to understand his rights;"[21] (4) the suspect was intoxicated, and he "did not know what he was signing;"[22] and (5) the suspect was confronted by the brother-in-law of his murder victim and beaten.[23]

As the sole judge of the credibility of the evidence and witnesses, the trial court had the discretion to believe Aguilar's testimony that he did not understand his *Miranda* rights because he was not thinking clearly at the time he read them and indicated to Detective Garcia that he understood them. The court also had the discretion to disbelieve Detective Garcia's testimony that Aguilar understood his rights. However, the videotape established that before Aguilar made his incriminating statements, Detective Garcia gave him the *Miranda* rights in Spanish on a pre-printed form, that Aguilar read the rights, and that he indicated he understood his rights. Aguilar then proceeded without hesitation to answer Detective Garcia's questions.

The videotape also showed Aguilar: (1) was coherent; (2) understood what Detective Garcia was saying to him; (3) was thinking clearly; (4) wanted to talk to Detective Garcia about how he had stabbed Mosqueda; (5) was calm and cooperative, not sleepy,

---

[20]*Bell v. State*, 582 S.W.2d 800, 812 (Tex. Crim. App. 1979); *Casias v. State*, 452 S.W.2d 483, 488 (Tex. Crim. App. 1970).

[21]*Rogers v. State*, 549 S.W.2d 726, 729-30 (Tex. Crim. App. 1977) (finding reversible error in trial court's refusal to give jury general instruction on voluntariness of statement when evidence raised an issue that defendant lacked the mental capacity to understand and waive his rights before giving his statement).

[22]In *Ritchie v. State*, 164 Tex. Crim. 38, 296 S.W.2d 551, 554 (Tex. Crim. App. 1956), the evidence was undisputed that the defendant was intoxicated, but the trial judge found that he was not so intoxicated that he could not understand what he was doing. *Id*. Therefore, the trial judge "instructed the jury not to consider the [statement] unless they believed beyond a reasonable doubt that, prior to making the statement, the appellant was duly warned, and that thereafter he voluntarily and freely made the same and understood and signed it." The court of criminal appeals held that the trial court did not err in admitting the evidence and instructing the jury as he did. *Id*.; *see also Foster v. State*, 101 S.W.3d 490, 497 (Tex. App.–Houston [1st Dist.] 2002, no pet.) (noting that "[l]ack of sleep for as long as 16 hours does not, in and of itself, render a confession involuntary," and that "a person's illiteracy alone will not necessarily render his statement inadmissible").

[23]*Hamin v. State*, 47 S.W. 656 (Tex. Crim. App. 1898).

22

or confused; and (6) never asked to speak with an attorney or to terminate the interviews. Moreover, the evidence does not show that Aguilar could not understand his rights because he was ill or on medication, mentally disabled, "lacked the mental capacity to understand his rights," intoxicated, or under the influence of drugs. Thus, nothing in the videotape showed that at the time Detective Garcia gave Aguilar his *Miranda* rights, he did not knowingly, intelligently, and voluntarily waive them.

Furthermore, Aguilar testified at the suppression hearing that he wanted to confess to Detective Garcia and that he voluntarily confessed to him. Pursuant to article 38.22, section 5, nothing prevents admission of a statement that is either: (1) res gestae of the arrest or offense; (2) a statement that does not stem from custodial interrogation; or (3) *a voluntary statement, whether or not the result of custodial interrogation*. TEX. CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 2005) (emphasis added); *see Turner*, 252 S.W.3d at 583.

It is undisputed that Aguilar failed to expressly waive his rights; however, we hold Aguilar implicitly waived his rights. In *Barfield v. State*, the court of criminal appeals held Texas's oral-confession statute does not require an express verbal statement from the accused that he waived his rights prior to giving the statement. *Barfield v. State*, 784 S.W.2d 38, 40-41 (Tex. Crim. App. 1989), *overruled on other grounds*, *Zimmerman v. State*, 860 S.W.2d 89 (Tex. Crim. App. 1993). The *Barfield* court determined "that in reaching the voluntariness of a confession, [we should look] at the totality of the circumstances." *Id*. at 41.

Thus, based on the totality of the circumstances, we conclude that Aguilar knowingly, intelligently, and voluntarily waived his rights as required by article 38.22. *See Hargrove v. State*, 162 S.W.3d 313, 318-19 (Tex. App.–Fort Worth 2005, pet. ref'd) (finding

23

accused validly waived rights despite lack of explicit waiver); *State v. Oliver*, 29 S.W.3d 190, 193 (Tex. App.–San Antonio 2000, pet. ref'd) (finding, despite lack of explicit waiver, accused knowingly, intelligently, and voluntarily made a statement after reading his rights, indicating he understood them, and proceeding without hesitation to discuss circumstances surrounding the murder).

Under a constitutional challenge, the answer is the same. A lack of an express waiver by Aguilar of his *Miranda* rights does not, standing alone, render the oral confession inadmissible. *Turner*, 252 S.W.3d at 584. Rather, waiver is to be judged based upon the totality of the circumstances. *Id*. Again, based upon the totality of the circumstances, we hold Aguilar validly waived his rights under the United States and Texas Constitutions.

Therefore, we hold the trial court abused its discretion in granting the motion to suppress.

## V. Conclusion

We sustain the State's sole issue, reverse the order suppressing Aguilar's videotaped statements, and remand the case to the trial court for further proceedings consistent with this opinion.


ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion delivered and
filed this 6th day of November, 2008.

24