

# NUMBER 13-07-332-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**THE STATE OF TEXAS,** Appellant,

**v.**

**LUIS AGUILAR,** Appellee.

### On appeal from the 28th District Court
### of Nueces County, Texas.

## MEMORANDUM OPINION ON REMAND

**Before Justices Rodriguez, Garza, and Vela**
**Memorandum Opinion On Remand by Justice Vela**

Appellee, Luis Aguilar, was indicted for the offense of murder. *See* TEX. PENAL

CODE ANN. § 19.02(b)(1) (Vernon 2003). The trial court granted a motion to suppress

Aguilar's videotaped confession, ruling that he did not voluntarily, knowingly, and

intelligently waive his rights. The State requested that the trial court enter findings of fact and conclusions of law, but the trial court did not do so. The State appealed the trial court's order granting the motion to suppress. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (Vernon Supp. 2008).[1] We reversed the trial court's ruling, holding that Aguilar had validly waived his rights. *State v. Aguilar*, No. 13-07-332-CR, 2008 WL 5717811 (Tex. App.–Corpus Christi Nov. 6, 2008) (mem. op., not designated for publication). The court of criminal appeals remanded the case to us with instructions to 1) request the trial court to file findings of fact and conclusions of law and 2) to "reconsider the voluntariness of [Aguilar's] confession in light of those findings of fact and conclusions of law." *State v. Aguilar*, No. PD-059-09, 2009 WL 636534 *1 (Tex. Crim. App. Mar. 11, 2009) (per curiam, not designated for publication). On June 22, 2009, this Court marked as filed the trial court's findings of fact and conclusions of law. By one issue, the State asserts the trial court erred in granting the motion to suppress. We reverse and remand.

## I. BACKGROUND

On the morning of November 5, 2006, Jose Mosqueda was stabbed to death. Later that day, police arrested Aguilar and took him to the Corpus Christi Police Department, where Detective R.L. Garcia interviewed him. The interview was videotaped, and the videotape was played during the suppression hearing. Before Detective Garcia began to ask Aguilar questions about Mosqueda's murder, he gave Aguilar a document containing the Spanish-language version of his rights pursuant to Article 38.22 of the Texas Code of

---

[1]The State may appeal an order that "grants a motion to suppress evidence, a confession, or an admission, if jeopardy has not attached in the case and if the prosecuting attorney certifies to the trial court that the appeal is not taken for the purpose of delay and that the evidence, confession, or admission is of substantial importance in the case[.]" TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (Vernon Supp. 2008).

Criminal Procedure, and Aguilar waived his rights and confessed to stabbing Mosqueda.

Aguilar filed a motion to suppress, asserting that he never made a knowing, intelligent, or voluntary waiver of his rights as required by Article 38.22, Section 3. He contended that his videotaped confession was therefore involuntarily made and that any evidence obtained as a result thereof was inadmissible.

## II. STANDARD OF REVIEW

In reviewing the trial court's ruling on a motion to suppress, we apply a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007) (citing *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)). Appellate courts "should afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id*. In this case, a videotape of the confession was provided to the trial court at the suppression hearing and is included in the appellate record. "Such evidence is particularly helpful when an issue is contested." *See St. George*, 237 S.W.3d at 725; *Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000).[2] "We conduct a *de novo* review of

---

[2]In *Carmouche*, the court of criminal appeals addressed the effect a video recording can have on appellate review of a trial court's finding of fact when the recording contradicts testimony that would otherwise support the trial court's finding. In that case, a law-enforcement officer testified that the defendant had made gestures, indicating his consent to a request to conduct a search. *Carmouche v. State*, 10 S.W.3d 323, 331-32 (Tex. Crim. App. 2000). The incident had been recorded on videotape, and the recording was inconsistent with the officer's rendition of events. *Id*. Finding that "the videotape presents indisputable visual evidence contradicting the essential portions of [the officer's] testimony," the court held, "In these narrow circumstances,

evidence when the resolution of mixed questions of law and fact do not turn on an evaluation of credibility and demeanor." *St. George*, 237 S.W.3d at 725 (citing *Guzman*, 955 S.W.2d at 89). We review the trial court's decision for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *Id*. We will sustain the trial court's ruling if the ruling "is reasonably supported by the record and is correct on any theory of law applicable to the case." *Id*. (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)). The "deferential standard of review in *Guzman* also applies to a trial court's determination of historical facts when that determination is based on a videotape recording admitted into evidence at a suppression hearing." *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007) (quoting *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006)).

. When a trial court makes explicit fact findings, we determine "whether the evidence (viewed in the light most favorable to the trial court's ruling) supports these fact findings." *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). We then review "the trial court's legal ruling *de novo* unless the trial court's supported-by-the-record explicit fact findings are also dispositive of the legal ruling." *Id*.

---

we cannot blind ourselves to the videotape evidence simply because [the officer's] testimony may, by itself, be read to support" the court's ruling. *Id*. at 332.

In *Watson v. State*, Justice Hervey explained that "*Carmouche* illustrates how a reviewing court can overturn a lower court's ruling by considering all the evidence in the light most favorable to the ruling even when there is some evidence to support the ruling." 204 S.W.3d 404, 418 n.7 (Tex. Crim. App. 2006) (Hervey, J., dissenting).

*A. Aguilar's Videotaped Confession*

Aguilar's interview was conducted in Spanish. An English-language translation of it was admitted into evidence along with the videotape of the confession. With respect to the Article 38.22 warnings, the English translation of the videotaped confession reflects the following exchange between Detective Garcia and Aguilar:

Garcia:     Mr. Aguilar . . . before I talk to you. . .

Aguilar:    Uh-huh.

Garcia:     I have to give you your warnings okay.

            . . . .

Garcia:     [R]ead me this, what does it say in Spanish read me that.

Aguilar:    It says you have the right to remain silent you don't have to give any statement. Anything you say can be, can be it says and will be used as evidence against you in court it says.

Garcia:     Wait do you understand that right?

Aguilar:    Yes.

Garcia:     Okay put your initials there put your name here on top also put your initials.

Aguilar:    Only my initials?

Garcia:     Initials okay. What is the second right here?

Aguilar:    You have the right to hire an attorney have him present with you before and during a whatever interrogation which [sic] peace officers detectives or attorneys for the state. . . .

Garcia:     Okay put your initials. You do understand that right?

Aguilar:    Uh huh.

5

Garcia:     Okay let's go to the third one.

Aguilar:    If you don't have the means to hire an attorney you have the right that the court assign you one without payment it says to represent you before and advise you before and during any interview.

Garcia:     Do you understand?  Put your initials again.  The same thing next.

Aguilar:    If you permit any peace officer or attorney for the state ask [sic] you questions with or without your attorney representatives you still have the right to deny answering and put an end to the questions.

Garcia:     Here.

Aguilar:    You have the right to an examining trial a hearing in front of a judge to determine if the state has enough evidence to hold you or according to the law or be set free without any charges.

Garcia:     Do you understand your rights?

Aguilar:    Do you understand your rights, yes.

*B. Aguilar's Testimony*

Aguilar, a twenty-eight-year-old El Salvadoran native, testified[3] that he can read and write Spanish, but he could not read or write English.  Defense counsel asked him to read out loud the Article 38.22 warnings contained in the document, which Detective Garcia had asked him to read and sign before confessing to the murder.  This document was admitted into evidence as defendant's exhibit 1.  Aguilar read the first warning[4] and testified that he did not know what the warning meant.  When counsel asked him to read the second warning, he responded, "You have the right to hire an attorney" and stated that this warning

---

[3]Luis Aguilar testified at trial through a sworn interpreter.

[4]Aguilar read the first warning as follows:  "You have the right to remain silent.  You don't have to give any statement.  Anything you say can be used against you, as evidence against you in court."

6

"means that I had the right to ask for an attorney if I didn't have the money to get one." Aguilar read the third warning[5] and said that he did not know what it meant. However, he testified that he was familiar with the concept of what it means to hire a lawyer. Aguilar read the next warning[6] and testified that he did not know what it meant. When counsel asked him, "What do you think it means?", he said, "Well, maybe I think what it meant, that if the police officer caught me, that I didn't have to answer." When counsel asked him, "So you understood that back then?", he answered, "Yes." When asked to read the last warning, he replied, "You have the right to have an examining trial." He testified that he did not know what that meant. Counsel then told him:

Q.    Continue reading.

A.    A hearing before a judge.

Q.    Do you know what that is? What does that mean to you?

A.    I think that is what we are doing right now.

Q.    Continue.

A.    To determine if the State has enough evidence.

Q.    Do you understand what that means?

A.    Yes.

Q.    Continue.

A.    To detain you and continue according to the law, or to be set free

---

[5]Aguilar read the third warning as follows: "If you don't have the means to hire an attorney, you have the right for the Court to find you one without any payment so that he can represent you before and during any interview."

[6]Aguilar read the next warning as follows: "If you permit for any official—any peace officer or attorney from the State to ask you questions without an attorney being present, you still have the right to stop the answers and stop—deny answering, and put an end to the questions."

according—or to be set free without any charge.

Q.      Do you understand what that meant?

A.      Yes.

Aguilar stated that when he initialed and signed this document, no one asked him if he wanted to give up these rights.  When counsel asked him, "Did you know at that time that if you signed that document, it might mean that you were giving up whatever rights you had under the law here in the United States?", he replied, "No, I didn't know."  When counsel asked, "So did you feel that you had to answer the questions?", he said, "No."  He testified that he answered the questions because he wanted to.  However, he said that at the time he talked to Detective Garcia, he did not understand what the document said and that "He [Detective Garcia] just told me to read it and for me to put my initials on the little line."  When counsel asked, "But didn't he [Detective Garcia] also ask you if you understood as you were putting your initials on there?", he said, "Yes."  Aguilar testified that he indicated to Detective Garcia that he "understood" his rights.  When defense counsel asked him, "But now you are telling us that you didn't really understand?", he said, "Yes, I just read it and I put my initials."

On cross-examination, Aguilar testified that, with respect to defendant's exhibit 1, he "did understand the words; but I didn't understand what it contained."  Asked to explain how he was "able to read the words and not understand what they meant," he said that he was not "thinking clearly" "because of what had happened earlier" on the day of the murder.  When asked, "But normally you would be able to understand what it meant, correct?", he replied, "Yes."  Aguilar testified that he was able to read the document and that he placed his initials by each warning, circled "Si" where the document asked if he

8

understood his rights, and wrote his initials on the line following the word "Si." When the prosecutor asked him, "And so by that, you were saying you understood these rights, correct?", he replied, "Yes." He testified that he told Detective Garcia that he did understand his rights, but he testified that he did not know what he was doing. Aguilar also testified that he told Detective Garcia that he did know what he was doing, that he was willing to talk to him, that he wanted to tell him what he had done, that he wanted to confess to him, that nobody told him what to say, and that Detective Garcia did not force him to talk. He agreed with the prosecutor that he gave the statement "voluntarily" after reading the document and telling Detective Garcia that he understood everything in the document. When the prosecutor asked him, "[Y]ou told Detective Garcia that you understood what your rights were, correct?", he said, "Yes." And, when the prosecutor asked him, "[O]nce you started telling Detective Garcia about what had happened earlier that morning between you and Jose Mosqueda, at any point in your own mind did you want to stop?", he said, "No." He testified that he wanted to tell Detective Garcia what had happened, that he voluntarily told him that he had hidden the knife, and that he voluntarily took him to the knife's location. At no time did he tell Detective Garcia he wanted to talk to a lawyer.

*C. Testimony of Detective Garcia*

Detective Garcia testified that while in the interview room, Aguilar indicated to him that he understood his rights. He testified that Aguilar "did not appear to be under the influence of anything" and that Aguilar was neither coerced, threatened, nor promised anything in return for his confession. He stated that Aguilar never asked for an attorney and did not ask to terminate the interview. After the interview, Aguilar agreed to take him

9

to where he had hidden the knife and took him to a manhole, where the knife was recovered.  After Detective Garcia retrieved the knife, he took Aguilar back to the interview room.  He restarted the videotape and showed Aguilar the knife.  Aguilar said it was the knife he had used to stab Mosqueda.

After hearing the evidence and counsel's arguments, the trial court granted the motion to suppress.  We set out in full the trial court's findings of fact and conclusions of law as follows:

Findings of Fact

1.  Defendant made a number of statements that were incriminating and which were the result of custodial interrogation by Detective R.L. Garcia of the Corpus Christi Police Department.

2. The statements were duly recorded and videotaped by the Corpus Christi Police Department as required by Article 38.22(3) TCCP.

3.  Prior to making the statements, the defendant was provided with a Spanish translation of the warning set out in Section 2 of Art. 38.22, TCCP, and referred herein as DX-1.

4. The warnings were not read to the defendant, rather Detective R.L. Garcia required the defendant to read the warnings in Spanish and state whether he understood the warnings.  The defendant stated that he understood what he read.

5. The defendant placed his initial at the left-hand margin of each warning given to him in DX-1.

6.  The defendant circled the word "si" at the bottom of DX-1.

7. The defendant also placed his signature at the bottom of DX-1.

8. DX-1 contains no express waiver of rights.

9.  Detective R.L. Garcia did not read or explain the warnings to the defendant.

10.  Detective R.L. Garcia did not ask the defendant if he was waiving

10

or willing to waive his rights.

11. Detective R.L. Garcia had the defendant place his signature on DX-1 and then immediately began asking the defendant questions.

12. The defendant did not implicitly waive his rights.

13. The defendant did not expressly waive his rights.

14. The defendant is a native of El Salvador, who does not speak or understand the English language. He had a very limited education in El Salvador.

15. The defendant did not understand his rights and that he could invoke those rights.

16. The manner in which Detective R.L. Garcia began his interrogation was overreaching because there was no inquiry or showing that the defendant understood that the rights he was asked to read on DX-1 applied to him or could be invoked by him or whether the he [sic] was willing to waive those rights.

## Conclusions of Law

1. The defendant was in custody at all times while he was interrogated by police.

2. The defendant did not knowingly, intelligently, and voluntarily waive his rights as required under Art. 38.22, Sections 3(a)(2) and 3(a) TCCP.

3. Based on the totality of the circumstances, the defendant did not expressly or implicitly waive his rights.

4. The statement made by the defendant as a result of this custodial interrogation are not admissible at trial.

5. The exception found in Article 38.22, Section 3(c) does not apply in this case because the defendant's statements do not contain assertions of fact or circumstances that were later found to be true and which conduce to establish guilt.

6. Any and all evidence, statements, or admissions made by the defendant in this case, are tainted by the improperly obtained statements as set out above are deemed inadmissible, as well.

11

*A. Did Detective Garcia Engage in Overreaching?*

In finding of fact sixteen, the trial court stated that "[t]he manner in which Detective R.L. Garcia began his interrogation was overreaching. . . ." A confession is involuntary under the Due Process Clause "only if there was official, coercive conduct of such a nature that any statement obtained thereby was unlikely to have been the product of an essentially free and unconstrained choice by its maker." *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1999). Statements that courts have found involuntary under the Due Process Clause involve the crucial element of police overreaching and involve fact scenarios in which the suspect was subjected to threats, physical abuse, or extended periods of interrogation without rest or nourishment. *See Oursbourn v. State*, 259 S.W.3d 159, 170-71 (Tex. Crim. App. 2008) (collecting cases). Absent coercive police activity, a statement is not involuntary within the meaning of the Due Process Clause even if it was not the product of a meaningful choice by its maker. *Id*. at 170 (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)).

Article 38.22 of the code of criminal procedure is likewise aimed at protecting a suspect from police overreaching. *Id*. at 172. Specifically, Article 38.22, Section 6 provides that only voluntary statements may be admitted in evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 6 (Vernon 2005). This statute works in tandem with Article 38.21, which provides that an accused's statement may be used in evidence against him "if it appears that the same was freely and voluntarily made without compulsion or persuasion." *Id*. § 38.21. Claims of involuntariness under these statutes can be, but need

12

not be, predicated on police overreaching of the sort required under due-process analysis. *Oursbourn*, 259 S.W.3d at 172. Under Articles 38.21 and 38.22, Section 6, we may consider, in addition to any allegedly coercive police conduct, factors such as the suspect's youth, intoxication, mental retardation, or other disability that would not raise a federal due process claim. *Id*. at 172-73.

"'Voluntariness' under both constitutional and state law doctrines is to be measured according to the totality of the circumstances." *Smith v. State*, 779 S.W.2d 417, 427 (Tex. Crim. App. 1989). Viewing the evidence in the light most favorable to the trial court's finding, we find nothing in this record that could reasonably be considered police overreaching of the sort that would render a statement involuntary in either the due process or the statutory sense. Therefore, we hold that Aguilar's confession was not the product of police overreaching. *See Oursbourn,* 259 S.W.3d at 170, 172-73. Accordingly, the trial court abused its discretion in resolving this question against the State.

*B. Whether Aguilar Knowingly, Intelligently, and Voluntarily Waived His Rights*

In finding of fact fifteen, the trial court stated that Aguilar "did not understand his rights and that he could invoke those rights." In conclusion of law number two, the trial court concluded that Aguilar did not knowingly, intelligently, and voluntarily waive his rights as required under Article 38.22, Sections 3(a) and 3(a)(2) of the Texas Code of Criminal Procedure. Article 38.22 "prohibits the use of oral statements made as a result of custodial interrogation unless, *inter alia,* an electronic recording is made of the statement, *Miranda*[7] warnings are given, and the accused knowingly, intelligently, and voluntarily waives any

---

[7] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

rights set out in the warnings." *Turner v. State*, 252 S.W.3d 571, 583 (Tex. App.–Houston [14th Dist.] 2008, pet. ref'd); *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 3(a)(1)-(2) (Vernon 2005). An inquiry into the waiver of *Miranda* rights "'has two distinct dimensions.'" *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001) (quoting *Colorado v. Spring*, 479 U.S. 564, 573 (1987)). First, the waiver must be "'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Spring*, 479 U.S. at 573). Second, the suspect must have made the waiver "'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Spring*, 479 U.S. at 573). The "Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Spring*, 479 U.S. at 574. It is enough that a "suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.*

Under Articles 38.21 and 38.22 and their predecessors, fact scenarios that can raise a state-law claim of involuntariness include the following: (1) the suspect was ill and on medication and that fact may have rendered his confession involuntary; (2) the suspect was mentally retarded and may not have knowingly, intelligently and voluntarily waived his rights; (3) the suspect lacked the mental capacity to understand his rights; (4) the suspect was intoxicated, and he "did not know what he was signing"; (5) the suspect was confronted by the brother-in-law of his murder victim and beaten; and (6) "the suspect was returned to the store he broke into 'for questioning by several'" armed persons. *Oursbourn*, 259 S.W.3d at 172-73. As the sole judge of the credibility of the evidence and witnesses, the trial court had the discretion to believe Aguilar's testimony that he did not understand

14

his rights because he was not thinking clearly at the time he read them. The court also had the discretion to disbelieve Detective Garcia's testimony that Aguilar understood his rights. However, the videotape established that before Aguilar made his incriminating statements, Detective Garcia gave him the Article 38.22 rights in Spanish on a pre-printed form, that Aguilar read the rights, and that he indicated to Detective Garcia that he understood his rights. Aguilar then proceeded without hesitation to answer the detective's questions.

The videotape also showed Aguilar: (1) was coherent; (2) understood what Detective Garcia was saying to him; (3) was thinking clearly; (4) wanted to talk to Detective Garcia about how he had stabbed Mosqueda; (5) was calm and cooperative, not sleepy or confused; and (6) never asked to speak with an attorney or to terminate the interviews. Moreover, the evidence does not show that Aguilar could not understand his rights because he was ill or on medication, mentally disabled, lacked the mental capacity to understand his rights, intoxicated, or under the influence of drugs. Thus, nothing in the videotape showed that Aguilar did not knowingly, intelligently, and voluntarily waive his rights. The videotape presents indisputable visual evidence supporting Detective Garcia's testimony, and contradicting Aguilar's testimony and the trial court's ruling. We cannot ignore the videotape evidence simply because Aguilar's testimony may, by itself, be read to support the trial court's ruling. *See Carmouche*, 10 S.W.3d at 332.

Furthermore, Article 38.22, Section 5 limits the application of Section 3 of that statute. *Nguyen v. State*, No. PD-0888-08, 2009 WL 1873488 *8 (Tex. Crim. App. July 1, 2009). Article 38.22, Section 5 provides, in relevant part; "Nothing in this article precludes the admission . . . of a *voluntary statement*, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any

15

other statement that may be admissible under law." TEX. CODE CRIM. PROC. ANN. art. 38.22, § 5 (Vernon 2005) (emphasis added). Aguilar testified at the suppression hearing that he wanted to confess to Detective Garcia and that he voluntarily confessed to him. Accordingly, the trial court abused its discretion in concluding that Aguilar did not knowingly, intelligently, and voluntarily waive his rights as required under Article 38.22, Sections 3(a) and 3(a)(2).

*C. Did Aguilar Implicitly or Expressly Waive His Rights?*

In findings of fact twelve and thirteen and in conclusion of law number three, the trial court stated that Aguilar did not implicitly or expressly waive his rights. However, the record establishes that before Aguilar made his incriminating statements, he read his rights and told Detective Garcia that he understood them. Aguilar then proceeded to answer Detective Garcia's questions. It is undisputed that Aguilar failed to expressly waive his rights; however, we hold that he implicitly waived his rights. In *Barfield v. State*, the court of criminal appeals held that Texas's oral-confession statute does not require an express verbal statement from the accused that he waived his rights prior to giving the statement. *Barfield v. State*, 784 S.W.2d 38, 40-41 (Tex. Crim. App. 1989), *overruled on other grounds*, *Zimmerman v. State*, 860 S.W.2d 89 (Tex. Crim. App. 1993). The *Barfield* court determined "that in reaching the voluntariness of a confession, [we should look] at the totality of the circumstances." *Id*. at 41. Thus, based on the totality of the circumstances, we conclude that Aguilar knowingly, intelligently, and voluntarily waived his rights as required by Article 38.22. *See Turner*, 252 S.W.3d at 583 (holding that defendant validly waived his rights when he understood his rights and proceeded to answer questions); *Hargrove v. State*, 162 S.W.3d 313, 318-19 (Tex. App.–Fort Worth 2005, pet. ref'd) (finding

16

accused validly waived rights despite lack of explicit waiver); *State v. Oliver*, 29 S.W.3d 190, 193 (Tex. App.–San Antonio 2000, pet. ref'd) (finding that, despite lack of explicit waiver, accused knowingly, intelligently, and voluntarily made a statement after reading his rights, indicating he understood them, and proceeding without hesitation to discuss circumstances surrounding the murder). Such an implicit waiver is valid under Article 38.22 and under the United States and Texas Constitutions. *Turner*, 252 S.W.3d at 583-84. Thus, the trial court abused its discretion in finding that Aguilar did not validly waive his legal rights prior to giving his videotaped statement.

Therefore, we hold the trial court abused its discretion in granting the motion to suppress.

## V. CONCLUSION

We sustain the State's sole issue, reverse the order suppressing Aguilar's videotaped statement, and remand the case to the trial court for further proceedings consistent with this opinion.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Memorandum Opinion On Remand delivered
and filed this 29th day of October, 2009.

17