

## NUMBER 13-17-00173-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

---

**GREGORIO RAMIREZ,**                                                                      **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                                      **Appellee.**

---

### On appeal from the 357th District Court
### of Cameron County, Texas.

---

## MEMORANDUM OPINION

**Before Justices Contreras, Longoria, and Hinojosa**
**Memorandum Opinion by Justice Longoria**

Appellant Gregorio Ramirez was convicted of murder, a first-degree felony, and arson, a second-degree felony.  *See* TEX. PENAL CODE ANN. §§ 19.02(c), 28.02(f) (West, Westlaw through 2017 1st C.S). The jury returned a guilty verdict and assessed punishment at forty years' imprisonment for the murder conviction and twenty years'

imprisonment for the arson conviction. The sentences were ordered to run concurrently. Ramirez argues on appeal that (1) the trial court erred in denying his motion to suppress and (2) the evidence was legally insufficient to negate his self-defense theory. We affirm.

## I. BACKGROUND

Ramirez was charged by indictment with one count of capital murder, one count of murder, one count of arson, and one count of engaging in organized criminal activity. *See id.* §§ 19.02(c), 19.03(a)(2), 28.02(f), 71.02(a) (West, Westlaw through 2017 1st C.S). Prior to trial, Ramirez filed a motion to suppress (1) his statements given to police while in custody and (2) all evidence seized from searches executed without a valid search warrant. The trial court denied his motion to suppress in part and granted it in part, ultimately allowing all statements and evidence to be used in trial. Also prior to trial, the State dropped count four, engaging in organized criminal activity, and proceeded to trial on counts one through three. At the close of the State's evidence, the trial court granted a directed verdict in favor of Ramirez on count one, capital murder, and only counts two and three proceeded to the jury.

### A. Motion to Suppress Hearing

During the hearing on the motion to suppress, the State presented three witnesses from the Harlingen Police Department: Officer Manuel Tovar, Investigator Anthony Bonilla, and Detective Joel Yanes. The three witnesses testified to their involvement in the issuance and execution of the two contested search warrants and to their role in the detainment, interview, and arrest of Ramirez.

Officer Tovar testified in support of the search warrants, the first of which was issued on February 20, 2016. Tovar explained that at the time he drafted the affidavit, he

used a former affidavit from another case as a sort of "template" for his own. In doing so, Tovar testified that he neglected to change some of the prior case information before submitting his affidavit to the court. Though the affidavit contained his signature, he explained that the affidavit also contained the prior affiant's name, instead of his own, and the suspected offense as possession of marijuana. Tovar also testified that the author of the second search warrant affidavit, used his affidavit as a template. The second search warrant issued on February 22, 2016, was supported by an affidavit containing three different officers names and the same possession of marijuana allegation, not arson or murder.

As to the detainment, interview, and arrest of Ramirez, the State presented Investigator Bonilla and Detective Yanes. Bonilla testified that his unit traveled to Brownsville, where they believed Ramirez to be. Bonilla, along with other Harlingen Police Department investigators, Brownsville Police Department officers, and Department of Homeland Security investigators, went to the apartment of Ramirez's girlfriend to conduct a wellness check. Bonilla testified that at that point, they had information regarding a male "possibly shooting a female" in the truck that they had found on fire, which belonged to Ramirez. Bonilla stated that Ramirez and his girlfriend were found in the apartment and they were both asked to go with the officers to the Harlingen Police Department for questioning; both cooperated and agreed to go with the officers. Ramirez was handcuffed and taken by police car to the Harlingen Police Department. Bonilla testified that they did not have an arrest warrant at that time.

Detective Yanes testified that Ramirez was brought in on suspicion of a shooting and arson of a vehicle, but at that point, officers were not sure if there was an injury or

3

murder as the victim had not yet been discovered. Ramirez and his girlfriend were being interviewed simultaneously, though in separate interview rooms. Information from the girlfriend, coupled with the information regarding the shooting, the arson of the vehicle belonging to Ramirez, and the gun belonging to Ramirez found in the burned vehicle, led the officers to arrest Ramirez.

After the State's witnesses, the trial court reviewed the complained of search warrants and granted Ramirez's motion in part, ruling the evidence obtained via the second search warrant inadmissible. The trial court denied the remainder of the motion and overruled Ramirez's later objections that the physical evidence and videotaped statements of Ramirez were fruits of an illegal arrest.

## B. Trial

At trial, the State presented their theory that Ramirez murdered the victim in the early morning hours of February 20, 2016 and disposed of the victim's body in a canal later that day. Marcelino Silva, a night auditor for the Best Western in Harlingen, testified that he was working the evening of February 19, 2016, overnight into February 20, 2016. He testified that he saw a blue Ford pickup truck parked underneath the canopy awning in front of the hotel entrance at approximately 4:00 a.m. on February 20, 2016. At that time, he saw the two front seat occupants, which he believed to be a male and female, arguing before seeing the driver shoot the passenger. When he saw and heard the shot, Silva moved to the side and the truck "fled away."

The State also presented Elvira Pollock. Pollock explained that she saw a blue pickup truck enter a dirt road next to a canal in Harlingen, and shortly thereafter, she observed the same truck on fire. She called 9-1-1 immediately and when law enforcement

4

arrived, the pickup truck was engulfed in flames. She also testified that she had seen a "black passenger vehicle" enter the dirt road at the same time as the truck and that the black vehicle exited the road before she noticed the flames.

Pedro Ibarra, a detective with the Harlingen Police Department, testified that investigators were able to use the vehicle identification number on the burnt pickup truck to determine the vehicle was registered to Ramirez. Ibarra testified that officers had already received the information relating to a shooting that took place in a Ford pickup truck and they believed the burnt truck to be the same one involved in the shooting. With this information, officers were sent to make contact with Ramirez to question him and to perform a wellness check on his "girlfriend or his wife or somebody related to him" because of Silva's statement that a woman had been shot in Ramirez's vehicle. Subsequently, both Ramirez and his girlfriend were brought into the station. Ibarra testified that he conducted the interview of Ramirez's girlfriend with Detective Scott Vega, and that during her interview, she brought the officers to the area where the truck was left burning and the victim's body was thrown into the canal. It was this information that led to the discovery of the victim's body in the canal. After Ramirez's girlfriend led them to the area where the victim's body was left, the officers obtained search and seizure warrants for Ramirez's residence and his girlfriend's vehicle, a red sedan. On cross-examination, Ibarra testified that the victim was identified by his fingerprints and that he had a criminal history. He also explained that a black sedan was also seized and searched in the investigation.

Detective Yanes also testified during the trial. Similar to his testimony during the motion to suppress, Yanes relayed to the jury that there was a gun found in the burnt

pickup truck under the driver's seat; bullet casings and projectiles were also located there. The plastic parts of the gun had been damaged by the fire, but the serial number remained on the metal portion. Investigation revealed that the gun was purchased by Ramirez, and so Yanes interviewed him. Yanes stated that the interview was voluntary and there were no threats made against Ramirez to make him give a statement. The interview was recorded and played for the jury. In the interview, Ramirez tells Yanes that his truck had been repossessed and that he did not shoot anyone.

In addition to the search of Ramirez's truck and the interview of Ramirez, Yanes was involved in the search of the black sedan. In the sedan, they found a receipt and matchbook from the Santa Fe Steakhouse. The officers were able to get the surveillance video from the steakhouse and determined that Ramirez and his girlfriend went out for dinner and drinks on the same day the victim's body was discarded in the canal. Yanes also testified that the victim was unarmed, had no identifying information on him, such as a license or wallet, and also did not have a cell phone on his person.

Ramirez testified in his defense at trial. He claimed that he was intimidated by the actions of the victim that evening. He testified that after their evening drinking, he attempted to drop the victim off at the hotel where he was staying. When he asked the victim to get out of his truck, the victim became aggressive and angry, which lead to some arguing and shoving in the vehicle. Ramirez, claiming he felt intimidated, pulled out his loaded gun from under his driver's seat. He testified that the gun did not intimidate the victim, and instead the victim laughed and said he was going to "show [Ramirez] what to do with the gun" and had reached for the gun. At that point, Ramirez testified the victim appeared to be reaching down into his boot and Ramirez shot and killed the victim. After

6

he shot the victim, he stated that he panicked. He and his girlfriend then devised a plan to get rid of the victim's body and to burn his truck. Ramirez confessed to committing arson as alleged in the indictment.

The jury returned guilty verdicts on both counts. Ramirez was sentenced to forty years' imprisonment for the murder conviction, and twenty years' imprisonment for the arson conviction, and the trial court ordered the sentences to run concurrently. Ramirez's motion for new trial was denied. This appeal followed.

## II. MOTION TO SUPPRESS

By his first two issues, Ramirez argues that the trial court erred in denying his motion to suppress (1) his statements given to police while in custody after an "illegal arrest" and (2) all evidence seized from searches executed without a valid search warrant.

### A. Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard, giving almost total deference to the trial court's determination of historical facts and mixed questions of law and fact that rely on credibility, and reviewing de novo mixed questions of law and fact that do not depend on the evaluation of credibility and demeanor. *State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013). The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010). The trial court is entitled to believe or disbelieve all or part of a witness's testimony, even if that testimony is uncontroverted. *Id.* We apply a de novo standard of review to a trial court's application of the law of search and seizure to the facts, and we will sustain the

7

trial court's ruling if it is "reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* at 447–48.

### 1. Warrantless Arrest

By his first issue, Ramirez argues that the trial court committed reversible error by denying his motion to suppress his video statements because those statements were made pursuant to an illegal, warrantless arrest. Ramirez argues that at the time he gave his statement to the police, he was in custody. A person is in "custody" if, under the circumstances, a reasonable person would believe his freedom of movement was restrained to the degree associated with a formal arrest. *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). The "reasonable person" standard presupposes an innocent person. *Id.*; *Turner v. State*, 252 S.W.3d 571, 576 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd). The placing of handcuffs on a defendant does not, in and of itself, mean he is in custody. *Balentine v. State*, 71 S.W.3d 763, 771 (Tex. Crim. App. 2002). In *Balentine*, the Texas Court of Criminal Appeals held that the suspect was not in custody when he was handcuffed and placed in a patrol car because those actions were reasonably necessary to ensure the officer's safety. *Id.*

Ramirez contends that because he was handcuffed and taken to the Harlingen Police Department, he was "clearly under arrest." The Texas Court of Criminal Appeals has outlined at least four general situations that may constitute a person being in custody:

1. when the suspect is physically deprived of his freedom of action in any significant way,

2. when a law enforcement officer tells the suspect that he cannot leave,

8

3.      when law enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted,

4.      when there is probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave.

*State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013). With respect to the first three scenarios listed above, the restriction upon freedom of movement "must amount to the degree associated with an arrest as opposed to an investigative detention." *Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). The distinction between an "arrest" and an "investigative detention" will often depend upon several factors, including "the amount of force displayed by the officer, the duration of a detention, the efficiency of the investigative process and whether it is conducted at the original location or the person is transported to another location, the officer's expressed intent—that is, whether he told the detained person that he was under arrest or was being detained only for a temporary investigation, and any other relevant factors." *State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008). "If the degree of incapacitation appears more than necessary to simply safeguard the officers and assure the suspect's presence during a period of investigation, this suggests the detention is an arrest." *Id.* Furthermore, "[w]hat begins as a noncustodial detention ... may become a custodial arrest as a result of police conduct during the encounter." *Rodriguez v. State*, 191 S.W.3d 428, 477 (Tex. App.—Corpus Christi 2006, pet. ref'd); *see also State v. Ozuna*, 13-16-00364-CR, 2018 WL 2057274, at *4 (Tex. App.—Corpus Christi May 3, 2018, no pet. h.) (mem. op. not designated for publication).

There was testimony from the involved officers that Ramirez willingly went with the officers, and no force or threats were used.

9

> Where a person voluntarily accompanies police officers, who are then only in the process of investigating a crime, to a certain location, and he knows or should know that the police officers suspect he may have committed or may be implicated in committing the crime, we are unable to hold that under the circumstances such a person is restrained of his freedom of movement. Under those circumstances, he is not in custody.

*Dancy v. State*, 728 S.W.2d 772, 778–79 (Tex. Crim. App. 1987) (citations omitted).

Further, a defendant's presence at a police station by consent does not change into arrest by virtue of an officer's subjective view alone that the defendant was not free to leave absent an act indicating an intention to take the defendant into custody. *Id.* at 778; *see also Dowthitt*, 931 S.W.2d at 256. Here, the trial court heard testimony from the officers of Ramirez's willingness to accompany the officers to the police station for questioning and the ongoing investigation of a crime. The officers indicated to Ramirez that they were performing a wellness check and investigating a crime. The officers also testified that the use of the handcuffs for the transport is due to a department policy, for the safety of the officers. Ramirez was also given his *Miranda* warnings, as a precaution, prior to giving his recorded statement to the police. *See id.* at 777 (holding that "mere recitation of such warnings is indicative of proper cautiousness than it is of the officer's intent to arrest").

Based on all of the evidence, we hold the trial court did not abuse its discretion if it concluded Ramirez was not in custody when he gave his videotaped statements. Accordingly, the trial court did not err in denying Ramirez's motion to suppress his statements. *See Turner*, 252 S.W.3d at 582. We overrule Ramirez's first issue.

### 2. Defective Search Warrants

Ramirez also contends, by his second issue, that the trial court erred in denying his motion to suppress items seized as a result of defective search warrants. Ramirez argued that both issued and executed search warrants were defective; however, the trial

10

court held that only the second search warrant was defective. Ramirez argues that the first search warrant is defective because within the affidavit (1) it erroneously included the phrase: "said suspected party has committed the offense of possession of marijuana" and (2) the affiant's name was incorrect.

It is the duty of this Court to determine from the four corners of an apparently valid affidavit whether under the totality of the circumstances the magistrate had a substantial basis for concluding there was probable cause. *State v. Escobar*, 764 S.W.2d 570, 572 (Tex. App.—Houston [1st Dist.] 1989, pet. ref'd). We must review the legal sufficiency of the affidavit independent of the district court's decision. *Id.* Affidavits for search warrants must be interpreted in a commonsense and realistic manner. *Id.* Technical requirements and grudging attitudes by the reviewing courts would discourage officers from submitting evidence before acting. *State v. Cantu*, 785 S.W.2d 181, 183 (Tex. App.—Houston [14th Dist.] 1990, pet. ref'd); *see also Rodriguez v. State*, 232 S.W.3d 55, 61 (Tex. Crim. App. 2007). As long as the magistrate had a substantial basis for concluding that probable cause existed, we will uphold the magistrate's probable cause determination. *State v. McLain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011).

In view of the forgoing authority, we now turn to the affidavit itself for review. The affidavit contains numerous paragraphs, most with sub-paragraphs containing more detail and information. Reading the affidavit as a whole, we find that the two complained of issues are minor and do not negate the intent of the affiant. While it is clear that the affidavit contains the wrong affiant's name at first, the text following the error explains who the affiant is, and that name matches the signature at the bottom. Further, and more importantly, though it incorrectly accuses Ramirez of possessing marijuana, paragraph

11

four contains eight sub-paragraphs, each explaining in detail the information the officer believed constituted probable cause for the search, including information from two witnesses about a shooting which they observed happening in a blue Ford pickup truck and a vehicle matching that description registered to Ramirez being found in flames shortly after the alleged shooting.

Ramirez contends that the two complained of errors in the affidavit are misrepresentations and such misrepresentations were material and necessary to establish probable cause, rendering the warrant invalid. *See Franks v. Delaware*, 438 U.S. 154 (1978). In *Franks*, the United States Supreme Court recognized that if an affirmative misrepresentation is knowingly included in a probable cause affidavit and is material and necessary to establishing the probable cause, the warrant is rendered invalid under the Fourth Amendment. *Id.* The erroneous inclusion of the wrong name initially in the affidavit and the misstatement regarding possession of marijuana were immaterial and unnecessary to establishing probable cause. *See id.* Even excluding the erroneous marijuana allegation, we believe it certainly would have been reasonable for the magistrate judge to conclude that there was probable cause to suspect Ramirez of arson and participation in the witnessed shooting. *See Cantu*, 785 S.W.2d at 184. We overrule Ramirez's second issue.

### III.    LEGAL SUFFICIENCY

By his third issue, Ramirez contends that the evidence was insufficient to convict him of murder because the State failed to sufficiently negate self-defense.[1] During his

---

[1] During his testimony at trial, Ramirez conceded his guilt as to the arson charge. Therefore, he only raises his insufficient evidence claim as to his murder conviction.

12

testimony, Ramirez admitted to shooting and killing the victim, but claimed it was done in self-defense.

**A.     Standard of Review and Applicable Law**

"The standard for determining whether the evidence is legally sufficient to support a conviction is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Johnson v. State*, 364 S.W.3d 292, 293–94 (Tex. Crim. App. 2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*); *see Brooks v. State*, 323 S.W.3d 893, 898–99 (Tex. Crim. App. 2010) (plurality op.); *see also Kirk v. State*, 421 S.W.3d 772, 776–77 (Tex. App.—Fort Worth 2014, pet. ref'd) (applying the *Jackson* standard to the jury's rejection of a self-defense theory). Every single fact presented does not have to point directly and independently to the defendant's guilt; it is sufficient if the conclusion drawn is reasonable by the cumulative effect of all the incriminating circumstances. *Sorells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). The standard of review is the same for both direct and circumstantial evidence. *Id.* Furthermore, the jury serves as the exclusive judge of the facts, the credibility of the witnesses, and the weight given to the witnesses' testimony. *Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The jury may believe all, some, or none of the testimony presented. *Williams v. State*, 226 S.W.3d 611, 615 (Tex. App.—Houston [1st Dist.] 2007, no pet.). In our review, we must uphold the jury's verdict unless it is irrational or it is not supported by more than a mere modicum of evidence. *Gomez v. State*, 234 S.W.3d 696, 702 (Tex. App.—Amarillo 2007, no pet.).

We measure the legal sufficiency of the evidence against the elements of the offense as defined by a hypothetically correct jury charge. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011). A hypothetically correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrain the State's theory of criminal responsibility, and adequately describes the particular offense for which the defendant was tried. *Id*. Here, the State was required to prove that Ramirez murdered the victim. *See* TEX. PENAL CODE ANN. § 19.02. A person commits murder if he intentionally or knowingly causes the death of an individual or if he intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual. *See id*. § 19.02(b)(1)–(2).

A person is justified in using deadly force against another if he reasonably believes the force was immediately necessary to protect himself against the other's use or attempted use of unlawful force. *See* TEX. PENAL CODE ANN. § 9.31 (West, Westlaw through 2017 1st C.S.). The issue of self-defense is a fact issue to be determined by the jury, which is free to accept or reject it, as they are with all the evidence. *Harrod v. State*, 203 S.W.3d 622, 627 (Tex. App.—Dallas 2006, no pet.); *see also Garrison v. State*, No. 13-14-00372-CR, 2015 WL 4380925, at *4 (Tex. App.—Corpus Christi July 16, 2015, pet. ref'd) (mem. op. not designated for publication). When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). The State does not have to produce evidence to refute the self-defense claim but must always prove its case beyond a reasonable doubt. *Zuliani v.*

14

*State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *see Brecheen v. State*, 372 S.W.3d 706, 707–08 (Tex. App.—Eastland 2012, pet. ref'd).

**B.     Analysis**

Ramirez argues that the evidence is legally insufficient to support his conviction because the State failed to disprove his self-defense argument. While Ramirez admitted to shooting and killing the victim and then disposing of the victim's body and burning his truck to get rid of the evidence, he testified that he did so in self-defense. Ramirez testified that his fear was driven by the victim's aggression when asked to get out of Ramirez's truck in connection with the victim saying he was going to "show [Ramirez] what to do with the gun." Ramirez admitted that no weapon had been displayed until he took out his own loaded gun to "intimidate" the victim into getting out of the truck; no weapon was found on the victim's person. Ramirez also testified that there was some shoving that occurred between himself and the victim in the front seat of his truck, but the victim did not harm Ramirez.

The State presented evidence that Ramirez escalated the situation by drawing a fully loaded weapon against an unarmed man, shot and killed the victim, disposed of the victim's body in the canal, and burned his own truck to destroy any evidence. The State also elicited testimony from Ramirez that he never sought medical attention for the victim. The medical examiner testified that the victim was shot behind his left ear, indicating that he was not facing Ramirez at the time the shot occurred; Ramirez confirmed this in his story of events, stating that the victim was reaching for his boot at the time he shot him.

As the exclusive judge of the credibility of the witnesses, the jury was entitled to disbelieve appellant's version of the deadly encounter. *See Brooks*, 323 S.W.3d at 899;

15

*see also Rodriguez v. State*, No. 13-16-00396-CR, 2018 WL 2252882, at *3 (Tex. App.—Corpus Christi May 17, 2018, no pet. h.) (mem. op. not designated for publication). Based on the foregoing, we hold that a rational jury could have rejected Ramirez's self-defense claim and found beyond a reasonable doubt that Ramirez intentionally and knowingly caused the death of the victim. See TEX. PENAL CODE ANN. § 19.02(b)(1); *see also Saxton*, 804 S.W.2d at 914. Under the facts of this case, we conclude that the evidence was legally sufficient to support Ramirez's conviction. Ramirez's third issue is overruled.

## IV. CONCLUSION

We affirm the trial court's judgment.

NORA L. LONGORIA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
9th day of August, 2018.

16